ELSIA MAXINE WATSON, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 23299

January 20, 1994                   867 P.2d 400

*Gary E. Gowen,* Folkston, Georgia, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney, *James Tufteland,* Deputy District Attorney and *David Barker,* Deputy District Attorney, Clark County for Respondent.

## OPINION

*Per Curiam:*

Appellant Elsia Maxine Watson ("Watson") was convicted by a jury of one count of theft for receiving and using a medical services card from Clark County Social Services ("CCSS") after intentionally concealing her ownership interest in two "Totten trust" savings accounts. She now attacks that conviction. We

hold that the prosecutor failed to prove each element of the offense beyond a reasonable doubt, and therefore we reverse.

On January 3, 1990 Watson withdrew $15,000 from an account she held at First Western Savings Bank ("First Western"), leaving a balance in that account of nearly $10,000. She then purchased, with the withdrawn money, a certificate of deposit at PriMerit Bank ("PriMerit"). The money left at First Western was allegedly held by Watson "in trust" for her sister's children, and Watson claims that the account contained the proceeds from the sale of Watson's deceased sister's house.[1] The account at PriMerit was held by Watson "in trust" for her own children, and allegedly represented money Watson had earned over the years from savings, from a judgment in a civil lawsuit, and from the sale of an apartment building. At all times relevant to this action, Watson was unemployed.

Within days of the above transactions, Watson applied for a medical services card from CCSS. The holder of a CCSS medical services card is entitled to receive medical services on credit from University Medical Center ("UMC") without incurring an obligation to pay the account. CCSS then pays UMC for services rendered to the holder of a card.

Under CCSS guidelines, an applicant will be denied a medical services card if she owns assets, including money in bank accounts, valued at over $1,000-$2,000. When Watson applied for the card, an eligibility screener asked if she owned any bank accounts, and Watson stated that she did not. Watson then met with another CCSS employee who asked if she had bank accounts, and Watson again indicated that she did not. Without knowledge that Watson owned two bank accounts worth nearly $25,000, CCSS issued Watson a two-month medical services card in January 1990 and another in March 1990. CCSS paid $2,957.28 for services Watson received from UMC between January and April 1990. Watson's alleged welfare fraud was discovered when CCSS received an anonymous letter informing CCSS of the PriMerit account.

---

[1]There was evidence that both the First Western and PriMerit accounts were in Watson's name. CCSS workers testified that even "trust" accounts are considered assets of the named account holder. This is especially true of "Totten trust" accounts, which allow the owner to use the money during life, with the balance passing to the named beneficiaries upon the owner's death, thereby avoiding probate. *See* Byrd v. Lanahan, 105 Nev. 707, 710, 783 P.2d 426, 428 (1989) (citing In re Totten, 71 N.E. 748, 752 (N.Y. 1904)). In addition, the state presented evidence that Watson used the money in the accounts to pay for personal expenses. She allegedly depleted the First Western account, and approximately $5,000 remained in the PriMerit account on June 26, 1991.

Watson elicited testimony at trial, from CCSS workers, that "lump sum" assets received more than thirty months before the date of application for CCSS services *may* not be evaluated and *may* not result in the disqualification of an applicant for services. Watson claimed that both bank accounts contained money earned or received from the sale of a house and from a civil judgment more than thirty months prior to her CCSS application. She argued that she *might,* therefore, still be eligible for a card even though she owns the two accounts. Watson was convicted after a one-day trial.

It is axiomatic that the state must prove every element of a charged offense beyond a reasonable doubt. Slobodian v. State, 107 Nev. 145, 147-48, 808 P.2d 2, 3-4 (1991). Under NRS 205.0832(3), part of Nevada's general theft statute, the state must prove that a person knowingly caused the unlawful transfer of property or services through a misrepresentation.[2]

In the instant case a "transfer" occurred when CCSS paid for the medical services Watson received on credit from UMC. If Watson's bank accounts would have rendered her ineligible to receive a medical services card, she would have caused the unlawful transfer of funds from CCSS to UMC through her misrepresentation that she owned no bank accounts. Thus, it was the state's burden to show beyond a reasonable doubt that Watson's concealment of her accounts caused the unlawful, or wrongful, payment of money by CCSS to UMC.

The state never clearly showed that Watson would have been ineligible for the card had she disclosed the accounts. The prosecutor's only evidence was the testimony of one witness. Ms. Leavitt, the social worker who qualified Watson for the card, testified that had Watson disclosed the money, "under the manual, it would have made a difference . . . she would have had to use her own money to pay for her medical expenses." Watson,

---

[2]NRS 205.0832(3) provides:

A person commits theft if, *without lawful authority,* [s]he knowingly . . . [o]btains . . . personal property or [services] by a material misrepresentation with intent to deprive [a] person of the property or services. As used in this subsection, "material misrepresentation" means the use of any pretense, or the making of any promise, representation or statement of present, past or future fact which is fraudulent and which, when used or made, is instrumental in causing the *wrongful* control or transfer of property or services.

(Emphasis added.)

however, questioned this same witness, and another CCSS worker, on an alleged "lump sum" exception to the general rule that one may not own bank accounts worth more than $2,000. On cross-examination, both Leavitt and the other CCSS worker, Zachariah, stated that if Watson had revealed the accounts, they would have had to "verify" her, or would have had to look into the matter. Neither testified, when asked about the alleged exception, that Watson would have been disqualified from receiving CCSS benefits. After this questioning the state made no effort to clarify the provisions of the eligibility criteria or to introduce them into evidence for the jury. In sum, the state failed to show beyond a reasonable doubt that Watson would have been ineligible for the card had she disclosed the accounts.

We do not pass on the validity of Watson's claim. It is not possible to determine from the record whether Watson would have been eligible or ineligible for a medical services card under CCSS eligibility criteria, had the CCSS workers been told of the accounts. We do hold, however, that Watson's ineligibility was an issue of proof that must have been made at trial, and that it was the state's burden to show ineligibility beyond a reasonable doubt.

In view of our decision, we decline to address the other issues raised on appeal. The judgment of the district court is reversed.

