*1503 OPINION
By the Court,
Steffen, C. J.;
Appellant Kriseya J. Labastida’s infant son died of injuries inflicted by his father, who cohabited with Labastida. Labastida insisted that she had no knowledge of the father’s violent abuse. Labastida was acquitted of first-degree murder and child abuse, but convicted of second-degree murder and child neglect. The latter two convictions resulted in sentences of life in prison and a consecutive twenty years, respectively. Although Labastida insists that her convictions are infirm, we conclude that she was fairly tried and convicted and therefore affirm.

*1504
FACTS

[1]

On November 20, 1992, Thunder Michael Lightfoot Strawser was born to Labastida, a twenty-four-year-old, first-time mother, and Michael Strawser. At the time, Labastida and Strawser cohabited in a small, poorly illuminated, downstairs apartment. Although all areas of the apartment were within hearing distance of the other areas, the bedroom could not be seen from the kitchen area.
Thunder lived for only seven weeks. At approximately 3:00 p.m. on January 9, 1993, the baby stopped breathing, and Labastida frantically called 911. When the paramedics arrived, one paramedic observed evidence of injury to the infant despite the dimly-lit environment of the apartment. The paramedic who carried Thunder from the bedroom to improved lighting in the kitchen, testified that he felt a “crackling” associated with injuries suffered by the child. In the kitchen, the paramedic observed bites and bruises in various stages of aging on the child’s body. Shortly thereafter, the infant’s battered, broken, and bitten little body was taken to Washoe Medical Center, where the child soon died.
A deputy coroner testified to seeing bruises on the baby’s buttocks, marks on his face, and a “vivid” bite mark on the baby’s foot. The pathologist who performed the autopsy noted many abrasions and skin breaks, extensive bruising covering fifty to seventy-five percent of the baby’s face and body, bite marks on the baby’s face, a massively enlarged chin, and a frenulum tear— at least twenty-four hours old — which was consistent with blunt, generally nonaccidental, trauma to the mouth. The pathologist also observed conspicuous and extensive bruising on the baby’s buttocks, and injuries to the baby’s penis and scrotum. In addition, she noted that the infant’s skin was puffed out from the chin *1505 to the nipples, indicative of air dissecting through the lungs into the surrounding tissues (the cause of the “crackling” sound heard by the paramedic). X-rays revealed seventeen bone fractures that were at least a week old, including nearly all of the baby’s ribs in the back, a finger, and three fractures of the right leg.
After paramedics took Thunder to the hospital, Labastida and Strawser voluntarily agreed to go with police investigators to the police station. According to police officers, Labastida appeared upset but was not hysterical.
The police first interviewed Strawser, who hesitantly admitted to committing some abuse and claimed that he concealed his actions from Labastida by abusing the baby behind closed doors or while she was asleep. Strawser stated that he began abusing the infant three weeks prior to his death by shaking him when Labastida was not in the room. He claimed that he convincingly lied to Labastida about the causes of the baby’s apparent bruises and injuries, telling her that the baby had fallen off a bed and off the washing machine. Strawser also advised Labastida against obtaining medical assistance, encouraging her with indications that the baby was getting better and that through their prayers the baby would be healed.
After investigators interviewed Strawser and received a report from the coroner’s office, they interviewed Labastida. Upon hearing that her baby died, Labastida began to cry and was visibly upset. Labastida told the investigators that Thunder cried incessantly and that she had taken him to a pediatrician a few days after his birth and then again two weeks later, believing that the infant had gas. Labastida also consulted a breast-feeding specialist because of an alleged belief that her baby was suffering from colic, and that a change in her diet might be helpful to the child.
Labastida attributed the bruises and lacerations on the baby’s face, stomach, and neck to the baby’s uncut fingernails and his habit of pinching himself. She ascribed other bruises on the child to such of her activities as tying his bootie too tight, touching his wrist, and leaving him in a swing too long, thus causing bruises on his buttocks.[2] She claimed that she had only noticed the bruises the last three days of his life and believed that he was just a tender baby, easily subject to bruising. Labastida attributed the baby’s difficult breathing and swollen glands to a cold. She indicated that she had wanted to take him to a hospital earlier that morning, but Strawser persuaded her that the child was getting better.
When an investigator mentioned that the infant had suffered *1506 bone fractures, Labastida initially opined that the broken bones resulted from the emergency CPR performed before taking the child to the hospital. She expressed total disbelief upon learning that the ribs in his back had been broken for some time prior to his death. Labastida told the investigators that she failed to recognize that Thunder's incessant crying was due to abuse by a man she naively trusted. Because Strawser changed the baby at night, she claimed not to have seen any abuse, but remembered that the baby would scream at night. Labastida admitted to seeing Strawser playfully pinch and bite the baby's skin. She also observed Strawser "manhandling" or burping Thunder too roughly (hitting the baby's back with a closed fist) on one occasion, and on other occasions, tossing him up in the air roughly, but she disclaimed ever seeing Strawser hit, shake, bite, throw or otherwise injure the baby.
Labastida and Strawser were both charged with one count of murder, one count of child abuse causing substantial bodily harm, and one count of child neglect or endangerment causing substantial bodily harm. Subsequently, the State also filed a notice of intent to seek the death penalty against both Strawser and Labastida.[3]
*1507 Prior to the commencement of trial, Strawser entered a plea of guilty to all three counts. Labastida, outside the jury’s presence, unsuccessfully challenged the sufficiency of the Information on grounds that the aiding and abetting charge did not separately define the acts committed by either defendant.
At trial, the State called several medical experts who described the torturous, painful, and sometimes bloody abuse suffered by the tiny victim. An expert on bites described the apparent bruising and lacerations that many of the severe bites must have immediately produced. He testified that a nursing mother should have seen the severity of the injuries to the baby’s mouth, neck, and face and that one who changed and bathed the baby should have noticed the obvious bites on his stomach and the gruesome bites on his buttocks.
The pathologist who performed the autopsy testified that a nursing mother, one changing diapers, and one trained in anatomy and physiology (as Labastida allegedly was) would have seen the injuries to the baby’s mouth and throat and other external injuries. The pathologist indicated that “the baby actually died from overwhelming infection due to seepage of contaminated debris into the chest cavity.”[4]
Labastida’s landlady, who lived upstairs, testified that Labastida rarely left the small basement apartment.[5] The landlady *1508 testified that she heard the painful sounding screams from the baby four or five times during the last two weeks of his life. The morning after a night when the baby screamed for two hours, the landlady tried to convince Labastida to take the baby to the doctor, but Labastida sternly insisted that the baby only had the colic. During this visit, the landlady recalled Labastida staring intensely and very fiercely at Strawser. Labastida, however, never spoke harshly of Strawser to the landlady.
Strawser also testified, admitting to the abuse and claiming that Labastida did not recognize that the baby was being abused and that he convincingly concealed his actions from her and lied to her about the cause of the child’s injuries.[6] Labastida did not testify at trial.
During the jury’s deliberations, the clerk of the court inadvertently delivered excluded evidence to the jurors. This “nonevi-dence” consisted of a magazine with a baby on the cover; the baby was defaced, with a goatee, angled eyebrows, and horns. Also written on the cover was a new caption stating, “ ‘Devil Babies.’ Do you have one?” The magazine was found in Labastida’s apartment several weeks after Thunder’s death and was given to the police. The trial court had rejected the magazine as evidence because there was no foundational basis for its admission. The jurors saw the cover of the magazine, but did not peruse its pages. The parties’ counsel were informed of the error later that evening. The district court convened the jurors and advised them that the magazine was not admitted into evidence because it was not connected to Labastida and directed the jury not to consider the magazine’s defaced cover. The jurors agreed to disregard the magazine. Labastida unsuccessfully moved for a mistrial, arguing that the magazine’s cover was highly prejudicial.
Two other incidents of note also occurred: First, as the jury was breaking for lunch, three alternate jurors were escorted into the jury room to retrieve their coats and personal belongings. Second, a deputy prosecutor spoke to a juror, inquiring about dinner, while the juror was in the jury box. This occurred in the presence of other jurors just after the jury had been sent home for *1509 the night. However, the appellate record does not contain any transcript of the conversation, including any objection or any ruling on an objection. The next day, defense counsel’s motion for a mistrial was denied. The hearing on the motion was also omitted from the record.
The jury found Labastida guilty of second-degree murder and child neglect, and acquitted Labastida of first-degree murder and child abuse. The district court sentenced Labastida to life imprisonment for second-degree murder and a consecutive twenty years in prison for child neglect. This appeal followed.

DISCUSSION

On appeal, Labastida contends that her acquittal on felony child abuse charges invalidates her conviction for second-degree murder, that the Information containing the charges against her was fatally defective, that her conviction for child neglect constituted double jeopardy, and that trial irregularities deprived her of a fair trial.

Whether acquittal of the felony child abuse charge required acquittal of second-degree murder

Labastida contends that since the jury acquitted her of felony child abuse, her acquittal of second-degree murder was mandated. Labastida supports her argument with the untenable proposition that she cannot be lawfully convicted of second-degree murder based upon child neglect. Her premise is that because the evidence was directed solely to proof of death from child abuse, a charge for which she was acquitted, no other evidence existed to support a finding of an unlawful killing with malice aforethought, elements required for second-degree murder.[7]
The evidence of record clearly supports Labastida’s conviction for second-degree murder. Based upon the trial evidence, including expert testimony, it would have been virtually impossible for a nursing mother to have overlooked the extensive, extremely severe injuries inflicted on her baby over a period of time. The jury therefore could have drawn alternative inferences from such evidence.
First, the jury could have found Labastida guilty of child abuse and first-degree murder based upon the grounds that (1) she aided and abetted Strawser in the unlawful killing by observing or being manifestly aware that Strawser was willfully causing the infant to *1510 suffer dangerously severe and unjustifiable injury and pain as a result of abuse, and (2) by doing nothing to stop this abuse when she was responsible for the child and it was clearly possible for her to have taken preventive measures. See NRS 195.020; 200.030(1)(a); 200.508(l)(a). The jury could then have elected to give Labastida the benefit of leniency based upon a finding that her involvement was much less than that of Strawser. See State v. Lindsey, 19 Nev. 47, 5 P. 822 (1885); State v. Fisco, 58 Nev. 65, 70 P.2d 1113 (1937), overruled on other grounds by Fox v. State, 73 Nev. 241, 316 P.2d 924 (1957). Under such circumstances, Labastida can hardly complain at having been the recipient of the jury’s mercy. See Lindsey, 19 Nev. at 51-52, 5 P. at 823-24.
Second, NRS 200.070, in defining what is not involuntary manslaughter, states, “where the involuntary killing occurs in the commission of an unlawful act, which in its consequences, naturally tends to destroy the life of a human being, or is committed in the prosecution of a felonious intent, the offense is murder.” NRS 200.010 defines “murder” as “the unlawful killing of a human being, with malice aforethought, either express or implied . . . These statutes are harmonious in cases where the act that tends to destroy human life, or is committed with felonious intent, is reflective of express or implied malice. See NRS 200.020. Child neglect, as found in this case, constituted an unlawful act that tended to destroy a human life[8] and demonstrated the abandoned and malignant heart required for a conviction of murder. The evidence would strongly support the inference that Labastida, aware of the bodily evidence and pain-reflecting, incessant crying of her nursing child, unlawfully allowed or permitted Strawser to inflict such severe and pyramiding injuries on the child as would tend to result in the child’s death.[9]
*1511 The dissent cites to Sheriff v. LaMotte, 100 Nev. 270, 680 P.2d 333 (1984), and Johnston v. State, 101 Nev. 94, 692 P.2d 1307 (1995), for the proposition that child neglect is not the type of activity that is generally considered inherently dangerous because the referenced cases ruled that drunk driving resulting in death would not support a charge of second-degree murder. Our colleague is misguided. Neither LaMotte nor Johnston was based on the decision that drunk driving is per se not inherently dangerous. We noted, instead, that this determination was left to the legislature because “the Nevada Legislature has set the punishment for killing or seriously injuring another while driving a vehicle under the influence of intoxicants .... Expansion of the range of punishments for those drunk drivers who kill fellow motorists or bystanders would constitute an impermissible judicial excursion into the Legislature’s domain.” Johnston, at 95, 692 P.2d at 1308 (citing LaMotte, at 272-73, 680 P.2d at 334).
Conversely, in the instant case, the legislature has not set the punishment for those who allow their child to be abused to death by another. It thus seems clear that malice can be implied in cases where, as here, child neglect rises to the level of inherent dangerousness.

Whether the Information was sufficient to adequately advise Labastida of the charges against her

Labastida contends that the Information prevented her from determining the exact nature of the charges against her because *1512 the Information provides alternatives and disjunctives and specifies no acts committed by herself or acts by Strawser which she aided and abetted. She also claims that the State’s theory changed on several occasions during trial.
Labastida’s position is without merit. Each of the counts in the Information provides a sufficient characterization of the crime and description of the specific acts chargeable to the accused to enable Labastida to defend herself against the accusations. See Simpson v. District Court, 88 Nev. 654, 660, 503 P.2d 1225, 1229 (1972). The words in Count I of “permitting, allowing, or failing to restrain one another” from killing the named victim sufficiently describes Labastida’s actions of aiding and abetting, particularly given her affirmative duty to protect her child. Likewise, Count IPs language of causing, allowing, or permitting the baby to be injured or placing the baby in a position to be injured sufficiently notified Labastida of the child abuse charges against her. Moreover, Count III also adequately covered the acts upon which the jury could have found Labastida guilty of child neglect.[10]

Whether Labastida’s conviction on second-degree murder and child neglect violated the Double Jeopardy Clause

Labastida asserts that child abuse and child neglect are essentially the same conduct, have the same elements, and violate the same statute (NRS 200.508). Consequently, she claims that her acquittal of child abuse necessitates the voiding of her conviction for child neglect based upon the Double Jeopardy Clause. Labastida also submits that her convictions for second-degree murder and child neglect — which were allegedly based on conduct equivalent to child abuse — violate the Double Jeopardy Clause. See Athey v. State, 106 Nev. 520, 797 P.2d 956 (1990) (holding that convictions for felony child abuse and murder arising from conduct occurring on the same evening violated the Double Jeopardy Clause). She also claims that the facts of her case are similar to those in Athey, and consequently, are violative of the same clause.
NRS 200.508 criminalizes the abuse or the neglect of children, *1513 and the jury did not err in finding, based on the evidence or out of leniency, that Labastida’s actions constituted neglect, but not abuse. In addition, Athey is distinguishable from this case. Evidence showed that two of the three injuries resulting in the esophageal infection which caused the baby’s death occurred during the last few days of the baby’s life. However, indications of ongoing abuse (bites and extensive bruising) were apparent the last week of the baby’s life. Consequently, the evidence reflects discrete differences between acts of neglect and acts involved in the murder of the child. See Bludsworth v. State, 98 Nev. 289, 293 n.4, 646 P.2d 558, 560 (1982).

Whether Labastida was denied a fair trial because of the inadvertent submission of excluded evidence to the jury and improper contacts with the jury

As for trial irregularities, we conclude that the district court did not abuse its discretion in refusing to declare a mistrial. Certainly, the defaced magazine may have otherwise had some effect on the jury, but the jury was instructed to disregard the evidence and each juror affirmed that he or she could do so. In addition, we are persuaded that the jury deliberations were not contaminated because the alternate jurors did not interrupt the jury at a time when it was deliberating. Finally, we are unable to review the record for error as to the allegations of improper prosecutorial-juror discussions since no aspect of the matter was included in the record on appeal. In any event, we are convinced that trial irregularities were harmless and were not prejudicial to Labastida.
We have reviewed all other arguments and issues raised by Labastida and conclude that they are without merit.[11]

*1514
CONCLUSION

For the reasons stated above, we conclude that Labastida was fairly tried and convicted, and therefore affirm the judgment of conviction entered by the district court.
Young and Rose, JJ., concur.

There is nothing to be gained by a critique of the dissenting justice’s view of the “undisputed” facts. Suffice it to note that the jury heard the facts and found Labastida guilty of second-degree murder and child neglect. We find it highly improbable that anyone could view the photographs in evidence of the severely beaten, bitten and battered infant and thereafter reach a reasoned conclusion that Labastida could have been unaware of the brutalization to which her child was being subjected. Moreover, if Labastida was indeed trapped in an “abusive relationship” with Strawser — a situation which tragically befalls all too many women in our society — it is difficult to believe that Strawser would have been all that concerned about concealing his abuse of the child from an intimidated Labastida. Furthermore, as observed in the body of this opinion, under the facts of this case, it would not have been difficult for a reasonable jury to conclude that Labastida was aiding and abetting Strawser in the systematic torture and destruction of her son simply because of the growing evidence of severe beatings graphically revealed on the face, head and body of her traumatized child, and her apparent unwillingness to do anything to prevent it.

The bruises on the buttocks were described at trial as “absolutely unavoidable” and “inescapably obvious.”

The dissent contends that the district court committed reversible error in refusing to allow then-Deputy District Attorney Richard Gammick to testify concerning his initial involvement in the case. We disagree. The dissenting justice picks up on Labastida's "Proper Person Supplemental Brief" and argues that Gammick should have been able to testify concerning the political ambition which motivated then-District Attorney Dorothy Nash Holmes to overcharge Labastida and selectively prosecute her personally in order to enhance her possibilities for reelection. First, our colleague's selective prosecution and due process argument was never raised in the trial court, as Labastida's offer of proof made no mention of selective prosecution or prosecutorial misconduct. Labastida's claim was based upon Gammick's knowledge concerning her insistence that "there was no factual basis for charging [her] with murder or felony abuse." Since the points raised by our colleague were not raised below they must be rejected. Gaston v. Hunter, 588 P.2d 326, 334 (Ariz. 1978).
Moreover, the district court properly rejected Gammick's proffered testimony on the basis that was urged below by Labastida. The evidence of record indicates that further facts were developed after Gammick was relieved of the case, and in any event, substantial mischief would result from a ruling by this court that would allow evidence of differences of opinion among prosecutors within a district attorney's office as to the charges being considered by the State. We need not address whether the district court correctly excluded Gammick's testimony on the basis of attorney-client privilege as it is clear that the testimony was properly excluded on the basis of executive privilege. This is not a case where factual evidence was being sought from a knowledgeable witness, but rather opinion testimony concerning a dispute within the district attorney's office as to the nature of the charges that should be filed against Labastida based upon the evidence developed before, during, and *1507 after Gammick’s active involvement in the case, and the motives behind the district attorney’s decision to charge more severely than Gammick. See EPA v. Mink, 410 U.S. 73, 90-91 (1972) (protection afforded to matters of law, policy, or opinion rather than factual material).
Finally, even if the State waived the executive or attorney-client privilege through the testimony of Officers Jenkins and Myers concerning their participation in the investigation and booking of Labastida, it is of no avail to Labastida, as she never asked the trial judge to reconsider his ruling excluding Gammick’s testimony after the two officers testified.

Although the pathologist opined that the baby died of “multiple injuries and sequelae [secondary effects] as a result of child abuse” and could not pinpoint why the heart stopped beating, the testimony indicated that the baby died basically by suffocating in esophageal infection. The pathologist testified this infection may have been caused by a blunt injury to the chest, perforation of the throat area in the back of the mouth, or “obstruction of the airways in the form of blunt trauma” or a combination of the three.
Strawser testified at trial that prior to the baby’s death, he tried to stop the baby’s crying by sticking his finger down the baby’s throat, causing a tear in the esophageal lining. He also claimed that in trying to stop the baby’s crying, he covered the baby’s mouth while pressing down on the stomach or chest area. These actions, in addition to the force applied which fractured the baby’s ribs along the spine, were viewed as initiating the leakage of contaminated debris into the baby’s chest cavity, which caused the baby’s death.

The dissent contends that the abuse to the baby occurred while Labastida was at work. However, the landlady testified that after the baby was born *1508 Labastida remained in the apartment with the infant doing her work until the child died. The woman also testified that Strawser worked both at the office and at home after the birth of the child on November 20, 1992, but that he worked during most of the month of December at the office while Labastida worked at the apartment with the baby.

During Strawser’s testimony, he mentioned that the night before Thunder’s death, he told Labastida that he squeezed and bit the baby, but during subsequent questioning by defense counsel, he reconfirmed that he did not tell her that he committed any abuse.

NRS 200.010 defines “murder” as “the unlawful killing of a human being, with malice aforethought, either express or implied.”

NRS 200.508(1) defines abuse, neglect or endangerment of a child as follows:
1. Any person who:
(a) Willfully causes a child who is less than 18 years of age to suffer unjustifiable physical pain or mental suffering as a result of abuse or neglect or to be placed in a situation where the child may suffer physical pain or mental suffering as the result of abuse or neglect; or
(b) Is responsible for the safety or welfare of a child and who permits or allows that child to suffer unjustifiable physical pain or mental suffering as a result of abuse or neglect or to be placed in a situation where the child may suffer physical pain or mental suffering as the result of abuse or neglect, is guilty of a gross misdemeanor unless a more severe penalty is prescribed by law for an act or omission which brings about the abuse, neglect or danger.

In response to the dissent’s charge that the majority has fashioned an affirmance for reasons attributable to the realities inherent in the election of judges, I gently remind my esteemed colleague that the author of this opinion is retiring at the end of this term and has no interest in the prospect of *1511 reelection. Moreover, our colleague relies on the case of Sheriff v. Morris, 99 Nev. 109, 118, 659 P.2d 852, 859 (1983), for the proposition of law that an accused may be convicted of second-degree murder if “he/she engages in ‘inherently dangerous’ conduct ‘that a potential felon foresees’ [his emphasis] will result [our emphasis] in death or mortal injury.” The referenced restatement of a previously-stated verbatim quote from Morris takes the unwarranted liberty of changing the degree of foreseeability of death or injury from that of a possibility to a certainty {will result). Morris actually declares that “[t]here can be no deterrent value in a second-degree felony murder rule unless the felony is inherently dangerous since it is necessary that a potential felon foresees the possibility of death or injury . . . .” (Our emphasis.) In our judgment, it is unthinkable that a nursing mother, who was almost constantly in her small apartment with the tiny, “incessantly crying” victim and Strawser, could have failed to foresee the strong possibility that the merciless beating the infant was receiving with obvious regularity would end in the baby’s death. Moreover, having been trained in anatomy and physiology, it is equally incredulous that Labastida could have been persuaded by the untrained Strawser that the infant’s proliferating injuries were not sufficiently serious to warrant taking the child to the hospital. Cogent evidence of what was occurring in that small apartment was seen by the jury in the form of the graphic photographs of the lifeless, brutalized body of the child.

Our dissenting colleague would seemingly outlaw use of the disjunctive in criminal pleading. We have read the same Information as our colleague and would simply note that use of the disjunctive was necessitated by a lack of precise information on how and by whom the tiny victim was murdered. Murder is often not committed in the clear light of day in the presence of witnesses. In any event, unlike our colleague, we do not perceive the need for a Urim and Thummim in order to decipher the acts with which Labastida was being charged.

We will here briefly address certain of the dissenting justice’s other objections to our affirmance of Labastida’s convictions. First, our colleague contends that the “legal conclusive presumption” of malice allegedly argued by District Attorney Holmes comes “as close as anything to explaining” why Labastida was convicted of murder. We remain unconvinced that the argument was even made. Our review and search of the record failed to produce evidence of any such argument. Labastida raised this argument in her pro per brief, but we have searched in vain for the argument in the record, including, of course, the transcript of the closing argument. In any event, the jury was instructed that they must look exclusively to the law as given in the instructions, and not to the argument of counsel. Therefore, if the phantom argument was indeed presented, it would have constituted harmless error.
Our dissenting colleague also contends that Labastida could not have been lawfully convicted of second-degree murder because the Information does not specifically charge her with murder in the second degree. He is mistaken. Under Nevada law, “first-degree murder and second-degree murder are not *1514 separate and distinct crimes which must be pleaded accordingly.” Sheriff v. Willoughby, 97 Nev. 90, 92, 624 P.2d 498, 498-99 (1981); see also State v. Whittle, 752 P.2d 489 (Ariz. App. Ct. 1985) modified, State v. Whittle, 752 P.2d 494 (Ariz. 1988) (holding that “second-degree murder is, by its very nature, a constituent part of first-degree murder, that it is an included offense”). Labastida was thus on notice that the trier of fact could find her guilty of either degree of murder.
We do not agree that the jury was instructed erroneously. We do, however, want to disabuse the reader of the applicability of the following contention by our colleague:
Instruction No. 35 told the jury that it was a violation of NRS 200.508 if Ms. Labastida had placed [the child] in a situation where the child may suffer physical pain. I do not think that there is any parent who has not, unwittingly, placed a child in a situation where the child may suffer physical pain. . . .
Virtually anyone could be convicted of child neglect under the instruction given to the jury. Every person who takes a child to a swimming pool or to an amusement park is placing the child in a situation where the child may suffer harm. These types of deliberate and intentional decisions do not constitute child neglect.
(internal quotations omitted) (emphasis in dissent).
Fortunately, the dissent’s position inaccurately represents Instruction 35. “[T]he situation” which the child must be “placed in” is clearly defined by the remainder of the instruction (omitted by our colleague) which states that the child must be placed in a situation where it “may suffer physical pain . . . as the result of abuse or neglect.” (Emphasis ours.) The district court also defined the terms “abuse” and “neglect” consistently with NRS 200.508(3)(a) in Instruction 36. Moreover, we have held that the phrase “physical pain” is constitutionally clear in its meaning. Bludsworth v. State, 98 Nev. 289, 292-293, 646 P.2d 558, 560 (1982).
None of the other points raised by the dissent warrant further discussion.