148 P.3d 727 (2006)
Marlo THOMAS, Appellant,
v.
The STATE of Nevada, Respondent.
No. 46509.
Supreme Court of Nevada.
December 28, 2006.
*730 David M. Schieck, Special Public Defender, Clark County, for Appellant.
George Chanos, Attorney General, Carson City; David J. Roger, District Attorney, and Steven S. Owens, Chief Deputy District Attorney, Clark County, for Respondent.
Before the Court En Banc.

OPINION
HARDESTY, J.
In this case, we review appellant Marlo Thomas's death sentence, returned by a jury after a second penalty hearing conducted pursuant to a remand by this court.

FACTS
Appellant Marlo Thomas and his brother-in-law, 15-year-old Kenya Hall, were charged with two counts of first-degree murder with the use of a deadly weapon and other crimes. The charges resulted from their early-morning robbery of the Lone Star Steakhouse and the stabbing deaths of two employees who were present during the robbery, Matthew Gianakis and Carl Dixon. Thomas was a former employee of the restaurant. Vince Oddo, the kitchen manager, was also present during the robbery but escaped without injury. He called 911 after his escape, and when police responded to the scene, Oddo identified Thomas as one of the perpetrators. Thomas, Hall, and Thomas's wife Angela Love were arrested later that day.
After their arrest, Hall was interviewed by Nevada Highway Patrol Officer David Bailey. Hall confessed to his role in the crimes and implicated Thomas. He agreed to plead guilty to lesser charges in exchange for testifying against Thomas. He testified at Thomas's preliminary hearing but then refused to testify any further and sought to withdraw his guilty plea. His preliminary hearing testimony was read into the record at Thomas's trial. A jury convicted Thomas of two counts of first-degree murder with the use of a deadly weapon, conspiracy to commit murder and/or robbery, robbery with the use of a deadly weapon, burglary while in possession of a firearm, and first-degree kidnapping with the use of a deadly weapon. After a penalty hearing, the jury returned two verdicts of death for the murders. Thomas was also sentenced to consecutive terms totaling life in prison without the possibility of parole for the remaining convictions.
*731 This court affirmed Thomas's conviction and sentence on direct appeal.[1] Thomas then sought post-conviction relief in a petition for a writ of habeas corpus. On appeal from the denial of his petition, this court concluded that Thomas's trial counsel were ineffective for failing to object to an improper penalty phase jury instruction on the possibility of sentence commutation. Accordingly, this court remanded the case for a new penalty hearing.[2]
On remand, the district court ordered that the penalty hearing be bifurcated into an eligibility phase and a selection phase. The State alleged four aggravators: (a) Thomas had a prior conviction for a felony involving violence or the threat of violence;[3] (b) he had a second such conviction;[4] (c) the murder was committed to avoid or prevent a lawful arrest;[5] and (d) Thomas was convicted in the instant proceeding of more than one murder.[6]
In the eligibility phase, the State read Hall's preliminary hearing testimony into the record. Other witnesses testified as to the facts of the crimes and the investigation. The State admitted the judgment of conviction for Thomas's 1990 conviction for attempted robbery, and the arresting officer from that incident testified that the victim told him Thomas and a cohort had robbed him at knifepoint but he did not know which assailant had the knife. The State also admitted a judgment of conviction for Thomas's 1996 conviction for battery with substantial bodily harm, and the victim testified that Thomas had beaten her with a gun and stomped on her chest. Officer Bailey testified about Hall's statements during questioning.
In mitigation, Thomas called family members who described his father's denial that Thomas was his son, his mother's beatings and harsh treatment of Thomas, his counseling of family members not to take his path, his scholastic and psychological problems as a child, Angela Love's bad influence on him, and his recent mellowing of temper and conversion to Christianity. Thomas called his mother to testify, and the State cross-examined her about statements she made about Thomas in 1990 which were contained in a juvenile court order certifying Thomas as an adult for that charge (exhibit 86). The State sought admission of exhibit 86 but was refused. After deliberating on death eligibility, the jury found all four aggravators. The jurors found seven mitigators, in that Thomas had: (1) accepted responsibility for the crimes; (2) "cooperated with the investigation but diverted the truth"; (3) demonstrated remorse; (4) counseled others against criminal acts; (5) suffered learning and emotional disabilities; (6) found religion; and (7) been denied by his father. The jurors determined that the aggravators outweighed the mitigators, and the hearing proceeded to the selection phase.
At the selection phase, the State called Patricia Smith, a Division of Parole and Probation records supervisor, who authenticated a set of 25 juvenile court petitions charging 11- to 17-year-old Thomas with crimes including vandalism, car theft, battery, and robbery (exhibit 85). Smith also authenticated exhibit 86, the juvenile court order listing Thomas's entire juvenile history and certifying 17-year-old Thomas as an adult in the 1990 robbery case, in which Thomas eventually pleaded guilty to attempted robbery.
Another division employee, John Springgate, authenticated two presentence investigation reports prepared for Thomas's convictions in 1990 of attempted robbery and in 1996 of battery with substantial bodily harm. Two victims of Thomas's prior crimes testified about those incidents. The State called ten corrections officers to testify about Thomas's behavior while in prison. Some of the officers authenticated prison discipline documents which included statements of other people, and some of the officers authenticated *732 documentary exhibits they had not authored or which pertained to incidents they were not involved in.
Finally, the fathers of Carl Dixon and Matthew Gianakis gave victim-impact testimony. Mr. Dixon referred to Thomas as "the lowest form of social sewage" and was immediately interrupted by an objection from Thomas's counsel. Without formally sustaining the objection, the district court advised Mr. Dixon to limit his testimony to the impact of his son's death on his family.
Thomas called five fellow inmates. They collectively testified that Thomas avoided problems in prison, counseled others to avoid problems, and gave them good advice. One testified that verbal abuse is mutual between inmates and prison staff and that some staff provoke disciplinary infractions. Thomas also called the warden of his present institution, who testified that Thomas was always respectful and polite to him and that inmates can mellow with time and maturity. Thomas's final witness was his mother. Thomas gave a statement in allocution, in which he expressed remorse and asked for forgiveness for "[stealing] two precious lives." After deliberations, the jury returned two verdicts of death. Thomas now appeals.

DISCUSSION
Application of Crawford v. Washington and the Confrontation Clause to the eligibility phase of a bifurcated capital penalty hearing
Thomas argues that the district court violated his right to confrontation[7] as interpreted in Crawford v. Washington[8] during the eligibility phase by allowing Officer Bailey to testify about Hall's statements during questioning and by admitting the transcript of the questioning. This claim lacks merit. We held in Summers v. State[9] that Crawford and the Confrontation Clause do not apply during a capital penalty hearing.
Admission of "other matter" evidence at the eligibility phase
Thomas also argues that the district court erred by allowing the State to present "other matter" evidence during the eligibility phase.
As we stated in Hollaway v. State, there are three proper purposes for which the State may introduce evidence at a capital penalty hearing: "to prove an enumerated aggravator, to rebut specific mitigating evidence, or to aid the jury in determining the appropriate sentence after any enumerated aggravating circumstances have been weighed against any mitigating circumstances."[10] Evidence submitted for the third purpose is what we mean by "other matter" evidence, and it is "not admissible for use by the jury in determining the existence of aggravating circumstances or in weighing them against mitigating circumstances."[11] As we indicated in Hollaway, evidence presented to "rebut specific mitigating evidence" is not "other matter" evidence, and it is permissible during the eligibility phase. If the defendant presents evidence relating to his character, childhood, mental impairments, etc., the State is entitled to rebut that evidence. However, Hollaway requires that the rebuttal evidence be targeted toward specific mitigation evidence; if it is not, it is not true rebuttal and is instead "other matter" evidence which the State can only present during the selection phase. Thomas's case is illustrative.
In mitigation during the eligibility phase, Thomas called his mother to testify. She testified that Thomas's childhood was "good" until she had a baby, at which point she stopped paying much attention to Thomas. In grade school, Thomas was angry and began to act out and get in fights, but when the school told her that Thomas needed help she denied it and argued with the school because she did not want to believe that Thomas was *733 troubled. When Thomas was in high school, his behavior escalated into trouble with the law, and she would beat him for his misbehavior. After serving six years for attempted robbery, Thomas was released; he behaved well until he met Angela Love and began using drugs, at which point he became violent and would not go to work.
On cross-examination, the State produced exhibit 86, the juvenile court order certifying Thomas as an adult for his 1990 robbery charge and containing statements purportedly by Ms. Thomas. The State asked Ms. Thomas if, in 1990, she said Thomas was "spoiled rotten" and "independent" or that her "parental control of him had been fair." Ms. Thomas said she did not recall making those statements. The State's conduct here was unobjectionable; the questions were proper rebuttal given Ms. Thomas's specific testimony that she had ignored Thomas and beaten him.
However, the State also asked her if she had said in 1990 that Thomas was "becoming more dangerous" or "would get into drugs or do things for quick money." The State's use of these statements was improper because they were not true rebuttal; Ms. Thomas did not testify on direct examination that Thomas was not dangerous or violent, was not involved in drugs, or would not commit crimes. In fact, Ms. Thomas testified on direct examination that she knew Thomas got in fights, was in trouble with the law, committed crimes, and had used drugs before he met Angela Love. Since these prior statements were not used to prove an aggravator or to rebut specific mitigating evidence, these statements were "other matter" evidence and were not proper at the eligibility phase.[12] However, Thomas did not object at the time, and we conclude that the error was minimal and did not affect his substantial rights.[13]
The State's comments on mitigating evidence at the close of the eligibility phase
Thomas argues that the district court erred by allowing the State to argue in its eligibility phase closing that there has to be "some causation, connection" between "the sad things" that occur in a person's life and the crime before "the sad thing" becomes a mitigating circumstance. Thomas objected, but the district court did not rule on the objection, instead saying, "The instructions will be given."
We agree with Thomas that the State's argument was improper. We have never required the defendant to show "causation" between a claimed mitigating circumstance and the crime. The prosecutor phrased his comment as if it were a matter of law rather than the State's position, which the jury could accept or reject. However, we conclude that the impropriety was not prejudicial. The statement was the second of two attempts by the State to make this argument. The first time, the State argued that "a mitigator is not any kind of hard luck fact in a person's life, it really isn't." Thomas objected, and the court sustained the objection "based on the fact that the Supreme Court has said anything can be a mitigator." The statement at issue came on the heels of that exchange. Further, the jury was instructed that mitigating circumstances are "factors . . . [which] may be considered, in the estimation of the jury, in fairness and mercy, as extenuating or reducing the degree of the Defendant's moral culpability." The jury was also instructed that it could consider as mitigating circumstances that "Marlo Thomas was raised without the benefit of a father figure" and had suffered as a child and young adult with learning and emotional disabilities. The instructions correctly required no "causation" between these factors and the crime. Nevertheless, we caution the State to avoid such misleading argument in the future.
Admission of alleged testimonial hearsay at the selection phase
Thomas also argues that the State violated Crawford and the Confrontation Clause at the selection phase by admitting evidence of his juvenile criminal history and his behavior while in prison. This claim lacks merit. As *734 we held in Summers,[14]Crawford and the Confrontation Clause do not apply at a capital penalty hearing.
Bad acts evidence and victim-impact testimony at the selection phase
Next, Thomas argues that cumulative bad acts testimony and an improper victim-impact statement rendered his penalty hearing fundamentally unfair. The State called as witnesses two Division of Parole and Probation employees, ten correctional officers, the victim of Thomas's 1990 attempted robbery, and the fathers of the two murder victims.
NRS 48.035(2) provides that relevant evidence "may be excluded if its probative value is substantially outweighed by . . . needless presentation of cumulative evidence." (Emphasis added.) "It is within the district court's sound discretion to admit or exclude evidence,"[15] and this court reviews that decision for an abuse of discretion or manifest error.[16]
Thomas apparently argues that the testimony of correctional officers about his behavior while in prison was unnecessarily cumulative. We conclude that the evidence was not excessively cumulative. Each of the corrections officers called gave evidence about different incidents with Thomas, except for part of the testimony by Officer Edwards, who detailed an incident where Thomas threw urine in a guard's face; that guard had already testified about the incident. This was the only testimony that repeated previous evidence. The jury was entitled to learn that Thomas had a lengthy prison disciplinary record and criminal history, and each incident presented revealed Thomas's capacity for threatening and potentially dangerous behavior. We conclude the district court did not abuse its discretion in allowing this evidence.
When giving his victim-impact testimony, Carl Dixon's father referred to Thomas as "the lowest form of social sewage" and was immediately interrupted by an objection from defense counsel. The district court admonished Mr. Dixon to restrict his testimony to the impact of his son's death on his family. There is no indication that the State arranged for Mr. Dixon to refer to Thomas in this manner or knew that he intended to. While the statement was improper, it does not require reversal. The court properly admonished Mr. Dixon. Presumably the jury expected that the victims' families abhorred Thomas. Further, Mr. Dixon did not express his views about sentencing, which is forbidden.[17]
Mitigating evidence and instructions at the selection phase
Thomas also argues that the district court erred during the selection phase by limiting his presentation of mitigating evidence and refusing a mitigation instruction.
Lack of premeditation
Thomas requested that the jury be instructed that "[t]he homicide occurred during a confrontation and as such there was no premeditated intent to cause the death." The district court refused to give the instruction. We conclude the district court did not err.
This court has held that NRS 175.554(1) requires the district court to instruct on "alleged mitigators upon which evidence has been presented and does not restrict such instructions to the enumerated statutory mitigators."[18] Evidence that Thomas lacked premeditation was admitted through the playing of a videotape of Thomas's interrogation, in which he said he killed Dixon and Gianakis in self-defense. Thus, Thomas was entitled to an instruction that he *735 was alleging lack of premeditation as a mitigating circumstance.[19]
However, Thomas's proposed instruction was improper because it was worded as a theory of law. NRS 175.554(1) requires instruction on mitigating circumstances alleged by the defense, not instruction on theories of law. Moreover, it was an unsupported theory of law. While a killing during a confrontation may be more commonly charged as second-degree murder or manslaughter, Thomas points to no authority for the proposition that premeditation to kill"[a] cold, calculated judgment and decision" rather than "a mere unconsidered and rash impulse"[20]cannot as a matter of law be formed during a confrontation. Further, the district court gave the catchall instruction set out in NRS 200.035(7), so the jurors were informed that they could find "any other mitigating circumstance," and Thomas argued to the jury that the lack of premeditation mitigated the crimes.
The role of an uncharged alleged participant in the crimes
Thomas claims that the district court erred by limiting his ability to argue that his wife Angela Love's responsibility for getting him back into drugs, her involvement in the crimes, and the State's failure to charge her for her role in the robbery constituted mitigating circumstances. This claim warrants no relief. Thomas established from at least two witnesses that Love was a bad influence on him and that he was doing well until he met her and got back into drugs. As to the failure to charge Love, on cross-examination of Detective Mesinar, who summarized the trial evidence for the jury, Thomas established that Mesinar submitted Love's case to the district attorney, who declined to prosecute her. On redirect, the State questioned Mesinar about the differing standards of proof for arrest and for proving a case. Thomas objected, but only based on the State's leading the witness.
In ruling on Thomas's objection, the district court said in the jury's presence, "And why the district attorney didn't decide to prosecute her is not a defense in the case because we're not here to defend the case. It's not even mitigation. So I don't know why you brought it up." In his reply brief, Thomas argues that this statement was error because it improperly limited the jury's ability to consider mitigating evidence. This argument is improper here because a reply brief is limited to answering any new matter set forth in the opposing brief.[21] Further, it lacks merit. NRS 175.552(3) provides that aggravating and mitigating circumstances must relate to "the offense, defendant or victim and on any other matter which the court deems relevant to sentence." Thomas fails to show how evidence that Love was not charged was relevant to his sentence or that admission of such evidence was required by the Constitution.[22]
Constitutionality of Nevada's death penalty scheme
Thomas argues that Nevada's death penalty scheme does not sufficiently narrow the class of people eligible for the death penalty. Thomas claims this argument is supported by Nevada's addition of six aggravating circumstances (NRS 200.033(10)-(15)) in the last 13 years. Other than arguing that the addition of aggravators to the statute expands rather than narrows the class of eligible persons, Thomas provides no reason for this court to depart from its previous holdings that Nevada's death penalty scheme is constitutional. We most recently so held *736 in 2005, in Weber v. State,[23] and each of these six aggravators was added before Weber.[24]
Thomas also argues that the Clark County District Attorney's Office bars a defendant from meaningful participation in the decision to seek death. This court has held that "[t]he matter of the prosecution of any criminal case is within the entire control of the district attorney," absent any unconstitutional discrimination.[25] Thomas points us to no authority in any jurisdiction for the proposition that the Constitution or Nevada law requires a prosecutor to allow a defendant any participation in the death penalty charging process. We have noted that executive privilege may prohibit forced disclosure of information about the charging process.[26]
Thomas also argues that the courts should have some oversight role in the decision to seek death. This court has indicated that the decision to seek the death penalty is a matter of prosecutorial discretion, to be exercised within the statutory limits set out in NRS 200.030 and NRS 200.033[27] and reviewable for abuse of that discretion, such as when the intent to seek the death penalty is not warranted by statute or is improperly motivated by political considerations[28] or race, religion, color, or the like.[29] Thomas points us to no authority in any jurisdiction for the proposition that the Constitution or Nevada law requires additional judicial oversight of the charging process.
Mandatory death sentence review
This court is required pursuant to NRS 177.055(2)(c)-(e) to review every death sentence and independently consider whether the evidence supports the finding of an aggravating circumstance or circumstances, whether the sentence of death was imposed under the influence of passion, prejudice, or any arbitrary factor, and whether the sentence of death is excessive, considering both the crime and the defendant.
Sufficiency of the evidence supporting the four aggravators
The evidence clearly supported the four aggravators found by the jury.
NRS 200.033(12) provides that first-degree murder is aggravated when "[t]he defendant has, in the immediate proceeding, been convicted of more than one offense of murder in the first or second degree." Here, Thomas was convicted of two first-degree murders during the guilt phase of his 2000 trial, and this court affirmed those convictions.[30]
NRS 200.033(2)(b) provides that first-degree murder is aggravated by the offender's prior conviction for a felony "involving the use or threat of violence." Thomas's 1990 conviction for attempted robbery and 1996 conviction for battery with substantial bodily harm were both proved by admission of the judgments of conviction. Each crime involved the use or threat of violence.[31]
*737 NRS 200.033(5) provides that first-degree murder is aggravated by its commission "to avoid or prevent a lawful arrest." Thomas killed two potential witnesses to his robbery, thereby preventing two people who knew him from identifying him later.[32]
Influence of passion, prejudice, or any arbitrary factor
As discussed above, Carl Dixon's father improperly referred to Thomas as "the lowest form of social sewage" during his victim-impact statement, but the district court immediately admonished Mr. Dixon, and there is no indication that this improperly influenced the jury.
Jurors found seven mitigating circumstances, several of which involved Thomas's childhood, character, and remorse for his crimes. The record does not reveal that the jury imposed the death sentence while "under the influence of passion, prejudice or any arbitrary factors."
Excessiveness of the death sentence
Thomas brutally murdered two young men by stabbing them to death at their place of work. While the restaurant manager was opening the safe in the office, Thomas handed his gun to his 15-year-old brother-in-law, left the office, and went to the kitchen to find the two victims. According to Hall, Thomas either lured or trapped 24-year-old Carl Dixon in the restroom and inflicted three to five severe stab wounds to Dixon's right chest and 15 defensive stab wounds to his extremities. Thomas then chased down 21-year-old Matthew Gianakis and stabbed him twice.[33] Thomas committed the murders while robbing his former employer. He had two previous convictions for crimes of violence and a substantial juvenile criminal history, as well as an extensive disciplinary record in prison, including numerous attempted and completed assaults on prison staff and a threat to kill a guard.
Thomas's childhood and upbringing were certainly not the best, and Thomas apparently has made some effort to counsel others against taking his path. However, the facts of this case are compelling: Thomas robbed his former employer at gunpoint, left the actual robbery to seek out two potential witnesses, and stabbed them both repeatedly. The victims were young men who should have been safe at their place of work. Thomas also had a violent criminal history and has shown a capacity for continued violence while in prison. We therefore conclude that the sentence of death was not excessive.

CONCLUSION
Thomas's penalty hearing, while not free of error, was fair. We conclude that none of arguments on appeal establish reversible error.
We therefore affirm Thomas's death sentence.
BECKER, GIBBONS and PARRAGUIRRE, JJ., concur.
ROSE, C.J., with whom MAUPIN and DOUGLAS, JJ. agree, concurring:
For the reasons stated in my concurring and dissenting opinion in Summers v. State,[1] I believe that capital defendants have a Sixth Amendment right to confront the declarants of testimonial hearsay statements admitted during an unbifurcated capital penalty hearing. Where the hearing is bifurcated into death-eligibility and selection phases, as it was in Thomas's case, I believe that the right to confrontation extends only to evidence admitted during the eligibility phase. Here, testimonial hearsayOfficer Bailey's testimony about Hall's statements and the transcript of that interrogationwas admitted during the eligibility phase, but Hall was unavailable to testify and Thomas had a prior opportunity to cross-examine him. I therefore concur in the majority's conclusion that it was not error under the Confrontation *738 Clause and Crawford v. Washington[2] to admit this evidence.
MAUPIN and DOUGLAS, JJ., concur.
NOTES
[1] Thomas v. State (Thomas I), 114 Nev. 1127, 967 P.2d 1111 (1998).
[2] Thomas v. State (Thomas II), 120 Nev. 37, 83 P.3d 818 (2004).
[3] NRS 200.033(2)(b).
[4] Id.
[5] NRS 200.033(5).
[6] NRS 200.033(12).
[7] U.S. Const. amend. VI.
[8] 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (holding that the Confrontation Clause bars admission of testimonial hearsay unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination).
[9] 122 Nev. ___, 148 P.3d 778, 2006 WL 3804869 (Adv.Op. No. 112, December 28, 2006).
[10] 116 Nev. 732, 746, 6 P.3d 987, 997 (2000).
[11] Id.
[12] See id.
[13] See NRS 178.602.
[14] 122 Nev. ___, 148 P.3d 778 (Adv.Op. No. 112); see also Johnson v. State, 122 Nev. ___, 148 P.3d 767, 2006 WL 3804868 (Adv.Op. No. 113, December 28, 2006).
[15] Means v. State, 120 Nev. 1001, 1008, 103 P.3d 25, 29 (2004).
[16] Id. at 1007-08, 103 P.3d at 29.
[17] See, e.g., Gallego v. State, 117 Nev. 348, 370, 23 P.3d 227, 242 (2001).
[18] Byford v. State, 116 Nev. 215, 238, 994 P.2d 700, 715 (2000).
[19] Thomas was charged with the murders under alternate theories of premeditation and felony murder. The jury verdicts do not indicate under which theory (or theories) it found Thomas guilty. Because jurors could have found him guilty based on felony murder, the general rule against alleging "residual doubt" as a mitigating circumstance does not appear to be implicated here. See Evans v. State, 112 Nev. 1172, 1202, 926 P.2d 265, 284-85 (1996).
[20] Byford, 116 Nev. at 237, 994 P.2d at 715.
[21] See NRAP 28(c).
[22] See Kaczmarek v. State, 120 Nev. 314, 336-37, 91 P.3d 16, 31-32 (2004).
[23] 121 Nev. 554, 585, 119 P.3d 107, 128 (2005); see also Leonard v. State, 117 Nev. 53, 82-83, 17 P.3d 397, 415-16 (2001).
[24] The child-under-14 and hate-crime aggravators were added in 1995, the multiple-murders aggravator in 1993, the nonconsensual-sexual-penetration aggravator in 1997, the school-property-or-functions aggravator in 1999, and the terrorism aggravator in 2003. See 1995 Nev. Stat., ch. 3, § 1, at 3; id. ch. 110, § 1, at 139; 1993 Nev. Stat., ch. 44, § 1, at 77; 1997 Nev. Stat., ch. 356, § 1, at 1294; 1999 Nev. Stat., ch. 319, § 4, at 1338; 2003 Nev. Stat., ch. 470, § 5, at 2947.
[25] Cairns v. Sheriff, 89 Nev. 113, 115, 508 P.2d 1015, 1017 (1973).
[26] See Labastida v. State, 112 Nev. 1502, 1506 n. 3, 931 P.2d 1334, 1337 n. 3 (1996) (indicating that the former district attorney could not give opinion testimony as to a dispute within the district attorney's office about charges to be filed in the case, but suggesting that "factual evidence . . . from a knowledgeable witness" could be admissible), modified and superseded on other grounds on rehearing, 115 Nev. 298, 986 P.2d 443 (1999).
[27] See generally Young v. District Court, 107 Nev. 642, 647-48, 818 P.2d 844, 847-48 (1991).
[28] See id.
[29] Cairns, 89 Nev. at 115, 508 P.2d at 1017.
[30] Thomas I, 114 Nev. 1127, 967 P.2d 1111.
[31] See NRS 200.380(1); NRS 200.481(1)(a).
[32] See generally Canape v. State, 109 Nev. 864, 874, 859 P.2d 1023, 1029-30 (1993).
[33] Thomas I, 114 Nev. at 1133-34, 967 P.2d at 1115-16.
[1] 122 Nev. ___, 148 P.3d 778 (Adv.Op. No. 112, December 28, 2006).
[2] 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).