**131 Nev., Advance Opinion 40**

IN THE SUPREME COURT OF THE STATE OF NEVADA

TIMOTHY R. BURNSIDE,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 56548

**FILED**

JUN 25 2015

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY
CHIEF DEPUTY CLERK

Appeal from a judgment of conviction in a death penalty case.
Eighth Judicial District Court, Clark County; Kathy A. Hardcastle, Judge.

*Affirmed.*

David M. Schieck, Special Public Defender, and JoNell Thomas, Alzora
Jackson, and Michael W. Hyte, Deputy Special Public Defenders, Clark
County,
for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson,
District Attorney, Jonathan E. VanBoskerck, Chief Deputy District
Attorney, and Marc P. DiGiacomo and Nancy Becker, Deputy District
Attorneys, Clark County,
for Respondent.

BEFORE THE COURT EN BANC.

*OPINION*

By the Court, GIBBONS, J.:

Appellant Timothy Burnside, along with his companion
Derrick McKnight, robbed and shot to death Kenneth Hardwick. A jury
convicted Burnside of first-degree murder with the use of a deadly

SUPREME COURT
OF
NEVADA

(O) 1947A

10/8/15: Corrected per letter to publishers. CJ

15-19371

weapon, burglary, conspiracy to commit robbery, and robbery with the use of a deadly weapon and sentenced him to death. In this opinion, we focus primarily on three issues.

First, we consider whether the district court erred by admitting testimony related to cell phone records and cell phone signal transmissions because the State failed to notice its witnesses as experts. We conclude that the cell phone company employee's testimony related to how cell phone signals are transmitted constituted expert testimony because it required specialized knowledge. In contrast, we conclude that a police officer's testimony about information on a map that he had created to show the location of the cell towers used by the defendants' cell phones constituted lay testimony. Although the State did not notice the cell phone company employee as an expert, we conclude that the error does not warrant reversal of the judgment of conviction.

Second, we consider whether the district court erroneously instructed the jury that the State had the burden of proving the "material elements" of an offense beyond a reasonable doubt without defining "material elements." Although the phrase "material elements" is unnecessary and should be omitted in future instructions, we conclude that the instruction is not so misleading or confusing as to warrant reversal.

Third, we consider whether Burnside's prior conviction for attempted battery with substantial bodily harm constitutes "a felony involving the use or threat of violence to the person of another" for purposes of the aggravating circumstance set forth in NRS 200.033(2)(b). We conclude that a conviction for an attempt to commit a violent felony

may fall within the purview of NRS 200.033(2)(b) if the State establishes that the overt act required for the attempt involved the use or threat of violence. Consistent with our decision in *Redeker v. Eighth Judicial District Court*, 122 Nev. 164, 172, 127 P.3d 520, 525 (2006), because the prior conviction was based on a guilty plea, the fact-finder could consider the charging documents, "written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented" underlying the prior conviction. Based on the evidence that could be considered in this case, the State failed to establish that Burnside's prior conviction for attempted battery with substantial bodily injury involved the use or threat of violence. Accordingly, this aggravating circumstance is invalid. The jury's consideration of this invalid aggravating circumstance does not, however, warrant reversal of the death sentence as the jury found no mitigating circumstances to weigh against the remaining aggravating circumstance and could consider the prior conviction and the circumstances underlying it in selecting the appropriate sentence in this case.

After considering these and Burnside's remaining claims of error and reviewing the death sentence as required by NRS 177.055(2), we conclude that Burnside is not entitled to relief from the judgment of conviction and death sentence. We therefore affirm the judgment of conviction.

## FACTS AND PROCEDURAL HISTORY

The victim in this case, Kenneth Hardwick, was a former professional basketball player who was known to carry quite a bit of cash, wear expensive clothing and jewelry, and carry cigars in a silver traveling

humidor. In the early morning of December 5, 2006, Hardwick was at the Foundation Room Lounge at the Mandalay Bay Resort and Casino in Las Vegas. Around 3:30 a.m., Burnside and McKnight entered the Foundation Room Lounge. About 30 minutes later, Hardwick left the Foundation Room Lounge and got in an elevator. McKnight followed Hardwick into the elevator. After exiting the elevator, Hardwick approached the west valet stand to retrieve his car, and McKnight reunited with Burnside in the casino and then walked to the parking garage near the west valet stand. At the valet stand, Hardwick noticed that an acquaintance was involved in a disagreement over a missing valet ticket, and he attempted to negotiate the dispute. Meanwhile, Burnside and McKnight got into a white Mazda, parked in a no-parking zone, and watched Hardwick for about an hour. When Hardwick eventually exited the parking structure, Burnside and McKnight followed him.

A short time later, Hardwick pulled up to a Jack-in-the-Box drive-thru window. At the time, Hardwick was speaking on his cell phone with his child's mother, who heard loud bangs over the phone. A video recording obtained from a surveillance camera showed a man wearing a "puffy" black jacket point a gun and shoot into Hardwick's car several times. Hardwick approached the drive-thru window, indicating that he had been shot. Hardwick suffered four gunshot wounds to his chest and both arms. While the gunshot wound to his chest caused the most damage to his body, all of the wounds resulted in great blood loss and contributed to his death.

Two Jack-in-the-Box employees heard the gunshots. One of the employees called 9-1-1 and reported that two men were involved in the

shooting. One of the employees saw one of the men retrieve a silver case from Hardwick's car.

Another witness heard the gunshots as she was walking to her car in a nearby parking lot. Shortly thereafter, she noticed a white car pull up next to her. The passenger exited the car, placed a gun in the car, and took off a black "puffy" jacket and put it in the car. The driver got out of the car and also removed a black "puffy" jacket and put it in the car. The two men ran in the direction of the Jack-in-the-Box. As the witness went to call 9-1-1, she observed the two men walking around the drive-thru at the Jack-in-the-Box. After placing the 9-1-1 call, she observed the two men running back to the white car. About a week later, the police showed the witness a set of photographs, and she tentatively identified McKnight as the driver of the white car but was unable to identify the passenger. Subsequently, after reviewing still photographs taken from the surveillance videos obtained from the Mandalay Bay, she was able to identify Burnside and McKnight as the men she saw after the shooting based on their clothing.

Other evidence linked Burnside to Hardwick's murder. The clothing that Burnside and McKnight were wearing when they were recorded by the Mandalay Bay surveillance cameras matched the clothing worn by the men in the Jack-in-the-Box video surveillance. McKnight's mother owned a white Mazda, which she had loaned to McKnight. In December 2006, McKnight approached a family friend, Albert Edmonds, and asked Edmonds to store a car in Edmonds' garage. Edmonds agreed. The following day, McKnight's mother retrieved the car from Edmonds' garage. During a search of Edmonds' home, police found 9mm

ammunition in a room in which McKnight had stayed in December 2006. Eight 9mm shell casings had been recovered from the Jack-in-the-Box drive-thru, all fired from a single firearm. During a search of Burnside's mother's home, the police recovered a day planner with a handwritten entry dated February 16, 2007, that suggested that Burnside's photograph had been shown on "Crime Stoppers." Additionally, Burnside's and McKnight's cell phone records showed that calls made from or received by their cell phones in the hours surrounding the murder were handled by cell phone towers near the Mandalay Bay.

The State charged Burnside with murder with the use of a deadly weapon, burglary, conspiracy to commit robbery, and robbery with the use of a deadly weapon. The jury convicted him of first-degree murder with the use of a deadly weapon and the remaining charged offenses.

The State also sought the death penalty for the murder. It alleged two aggravating circumstances: (1) Burnside had a prior conviction for a violent felony (attempted battery with substantial bodily harm in 2002), and (2) the murder was committed during the perpetration of a robbery.[1] The prosecution's evidence in aggravation primarily related to the circumstances of the crime as support for the felony aggravating circumstance under NRS 200.033(4). Respecting the prior-violent-felony conviction, the prosecution introduced the preliminary hearing testimony

---

[1]The State included a third aggravating circumstance in its notice of intent to seek the death penalty—that the murder was committed during the perpetration of a burglary—but withdrew that aggravating circumstance at the start of the penalty hearing.

of the prior victim, Tyyanna Clark. Burnside pleaded guilty to attempted battery with substantial bodily harm. As other matter evidence admissible under NRS 175.552(3), the prosecution introduced evidence of Burnside's conduct in prison and his juvenile and adult criminal history, which included arrests and/or convictions/citations for a litany of violent and nonviolent offenses. Finally, the prosecution presented victim-impact testimony from Hardwick's girlfriend, older brother Clifford, and his nephew Jamil. The jury learned that Hardwick had gone to college on a basketball scholarship, played professional basketball, and had four children. He was described as the "heart and soul" of the family and the life of the party with an infectious personality. He spoke with his parents and children daily. The witnesses also described the emotional devastation that Hardwick's family experienced over his loss.

Burnside's mitigation evidence focused primarily on his childhood, which was described by several family members. Although Burnside's siblings lived with their mother, he lived with an aunt when he was a young boy. His mother explained that she loved him but that his aunt lived nearby, was very attached to him, and wanted him to live with her. Burnside was very happy living with his aunt; family members testified that she spoiled him. A cousin who lived with him at the time described him as moody, smart, funny, and humble. When Burnside was eight years old, his aunt passed away. Devastated by her death, he became aggressive and difficult to handle. Through the rest of his minority, Burnside moved around frequently and lived with different relatives. Like other members of his family, he became involved with drugs and alcohol. According to one of his brothers, an uncle was brutally

murdered and "that's what messed up all of us." Burnside got into a fight at age 15 and was shot three times. Two years later, he was stabbed several times at a casino in Las Vegas. He was stabbed yet again in another incident several years later. His mother testified that Burnside was smart and an A student, but his school records showed that he occasionally received Bs, Cs, and Fs, with some improvement when he was at the Spring Mountain Youth Camp. His family expressed their love for him and asked the jury to spare his life.

The defense also called a corrections officer to describe the conditions in prison. Based on Burnside's record as a youth offender, which included infractions for fighting and property violations ("things associated with gang activity"), the witness opined that Burnside could be safely housed at Ely State Prison for life.

The jury found both aggravating circumstances. Although the defense offered 17 mitigating circumstances, none of the jurors found any mitigating circumstances. After concluding that "the aggravating circumstance or circumstances outweigh[ed] any mitigating circumstance or circumstances," the jury imposed a death sentence for the murder.[2] This appeal followed.

---

[2]The district court later sentenced Burnside to concurrent terms of 26 to 120 months for burglary and 16 to 72 months for conspiracy to commit robbery and two consecutive terms of 40 to 180 months for robbery with the use of a deadly weapon to be served concurrently to the burglary and conspiracy-to-commit-robbery sentences.

## DISCUSSION

Burnside argues that a plethora of errors occurred during the guilt and penalty phases of the trial. Although we address all of the claimed errors, we focus on three in particular. As to the guilt phase, we focus on his claims that (1) the district court erred by admitting testimony related to cell phone tower transmissions because the testimony fell within the realm of expert testimony and the State had not noticed its witnesses as experts and (2) the district court erroneously instructed the jury that the State had the burden of proving the "material elements" of an offense beyond a reasonable doubt without defining "material elements." As to the penalty phase, we focus on his challenge to the validity of the prior-violent-felony-conviction aggravating circumstance based on his conviction for attempted battery with substantial bodily injury.

*Guilt phase claims*

*Admission of cell phone tower records and testimony*

Burnside argues that the district court abused its discretion by admitting the defendants' cell phone records, which showed the location of cell phone towers that handled their cell phone calls, and by allowing a cell phone company records custodian to testify about those records and signal transmissions and a detective to testify about a map he created to show the locations of the cell phone towers. He complains that this evidence amounted to expert testimony, and because the State failed to notice the cell phone records custodian and the detective as expert witnesses, the evidence should have been excluded.

The State's notices of expert witnesses did not list any cell phone records custodians; its notice of lay witnesses identified records

Supreme Court of Nevada

(O) 1947A

custodians from four cell phone companies. When a records custodian for Sprint/Nextel began testifying at trial about cell phone tower locations, defense counsel objected because the witness had not been included in the State's notices of expert witnesses. Similarly, when the defense learned at trial that a detective would testify about information on a map that he had created to show the location of the cell phone towers used by the defendants' cell phones on the night of the murder, defense counsel objected that the detective would be providing expert testimony but the State had not noticed him as an expert. The district court overruled both objections, concluding that the Sprint/Nextel records custodian and the detective were not offering expert testimony.

Our review of the district court's ruling hinges on whether the witnesses testified as lay witnesses or as expert witnesses. The scope of lay and expert witness testimony is defined by statute. A lay witness may testify to opinions or inferences that are "[r]ationally based on the perception of the witness; and . . . [h]elpful to a clear understanding of the testimony of the witness or the determination of a fact in issue." NRS 50.265. A qualified expert may testify to matters within their "special knowledge, skill, experience, training or education" when "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." NRS 50.275. The key to determining whether testimony about information gleaned from cell phone records constitutes lay or expert testimony lies with a careful consideration of the substance of the testimony—does the testimony concern information within the common knowledge of or capable of perception by the average layperson or does it require some

SUPREME COURT
OF
NEVADA

(O) 1947A

specialized knowledge or skill beyond the realm of everyday experience? *See Randolph v. Collectramatic, Inc.*, 590 F.2d 844, 846 (10th Cir. 1979) (observing that lay witness may not express opinion "as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness"); Fed. R. Evid. 701 advisory committee's note (2000 amend.) ("[T]he distinction between lay and expert witness testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." (internal quotation marks omitted)); *State v. Tierney*, 839 A.2d 38, 46 (N.H. 2003) ("Lay testimony must be confined to personal observations that any layperson would be capable of making.").

We first consider the detective's testimony. The detective reviewed the cell phone records and cell site information and used that data to create a map showing the locations of the cell phone sites that handled calls from the cell phones registered to Burnside and McKnight during the time period relevant to the murder. The map showed that several calls were made between Burnside's and McKnight's cell phones during the early morning hours of December 5, 2006, and the signals related to those calls were transmitted from cell sites near the Mandalay Bay. Burnside did not object to the admission of the map but objected to the detective's testimony explaining the information reflected on the map on the ground that he was not an expert. We conclude that the map and the detective's testimony were not based on specialized knowledge or reasoning that can be mastered only by a specialist and therefore the State was not required to notice the detective as an expert witness. *See*

*United States v. Baker*, 496 F. App'x 201, 204 (3d Cir. 2012) (concluding that federal agent's testimony as to his use of computer mapping software to create map of defendant's location from cell phone records did not involve expert testimony); *United States v. Evans*, 892 F. Supp. 2d 949, 953 (N.D. Ill. 2012) (concluding that federal agent could provide lay opinion testimony regarding his creation of maps showing location of cell towers used by defendant's cell phone in relation to other locations relevant to crime because creating maps did not "require scientific, technical, or other specialized knowledge"); *Gordon v. State*, 863 So. 2d 1215, 1219 (Fla. 2003) (concluding that police officer's comparison of locations on cell phone records to locations on cell site maps did not constitute expert testimony). Therefore, the district court did not err by admitting the detective's testimony as that of a lay witness.

The Sprint/Nextel record custodian's testimony is a different matter. The witness explained how cell phone signals are transmitted from cell sites and that generally a cell phone transmits from the cell site with the strongest signal, which is typically the cell site nearest to the cell phone placing the phone call. He also explained that there are circumstances when the cell site nearest the cell phone is not used, such as when there is an obstruction between the cell phone and cell site or when a nearby cell site is busy. This testimony is not the sort that falls within the common knowledge of a layperson but instead was based on the witness's specialized knowledge acquired through his employment. Because that testimony concerned matters beyond the common knowledge of the average layperson, his testimony constituted expert testimony. Other courts have reached the same conclusion. *See, e.g., United States v.*

*Yeley-Davis*, 632 F.3d 673, 684 (10th Cir. 2011) (concluding that "testimony concerning how cell phone towers operate constituted expert testimony because it involved specialized knowledge not readily accessible to any ordinary person"); *Wilder v. State*, 991 A.2d 172, 198 (Md. Ct. Spec. App. 2010) (concluding that to admit evidence of cell phone cite location, prosecution must offer expert testimony to explain functions of cell phone towers, derivative tracking, and techniques of locating and/or plotting origins of cell phone calls using cell phone records); *Wilson v. State*, 195 S.W.3d 193, 200-02 (Tex. Ct. App. 2006) (involving admission of cell phone records custodian's expert testimony explaining transmission of cell phone signals and which cell phone towers received signals from defendant's cell phone). Therefore, the State was required to provide notice pursuant to NRS 174.234(2) that the records custodian would testify as an expert witness. It failed to do so, instead including the records custodian on its notice of lay witnesses. Burnside, however, has not explained what he would have done differently had proper notice been given, and he did not request a continuance. *See* NRS 174.295(2). We are not convinced that the appropriate remedy for the error would have been exclusion of the testimony. *See id.* But even if that were the appropriate remedy, we also are not convinced that the admission of the evidence substantially affected the jury's verdict considering that the cell phone evidence was cumulative to the Mandalay Bay video surveillance evidence and the testimony of Stewart Prestianni, both of which placed Burnside and McKnight at Mandalay Bay during the relevant time period, *see* NRS 178.598 (harmless error rule); *Valdez v. State*, 124 Nev. 1172, 1189, 196 P.3d 465, 476 (2008) (observing that nonconstitutional error requires reversal "only

if the error substantially affects the jury's verdict"); *see also Kotteakos v. United States*, 328 U.S. 750, 776 (1946).

*"Material elements" of the charged offenses*

Burnside challenges an instruction that is often used in criminal trials in this state: "The Defendant is presumed innocent until the contrary is proved. This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that the Defendant is the person who committed the offense." He complains that the instruction does not explain which elements are "material" and therefore left the jury to speculate which elements were "material." According to Burnside, the instruction thereby lessens the State's burden of proof. Although this court has upheld the challenged language on numerous occasions, *see, e.g., Nunnery v. State*, 127 Nev., Adv. Op. 69, 263 P.3d 235, 259-60 (2011); *Morales v. State*, 122 Nev. 966, 971, 143 P.3d 463, 466 (2006); *Crawford v. State*, 121 Nev. 744, 751-52, 121 P.3d 582, 586-87 (2005); *Gaxiola v. State*, 121 Nev. 638, 649-50, 119 P.3d 1225, 1233 (2005); *Leonard v. State*, 114 Nev. 1196, 1209, 969 P.2d 288, 296 (1998), we have not addressed the particular argument raised here.

An Oklahoma court has considered an instruction similar to the one used in this case. In *Phillips v. State*, the defendant complained that an instruction advising the jury that "the State is required to prove beyond a reasonable doubt 'the material allegations of the Information', and that the defendant is presumed innocent of the crime charged against him and innocent of 'each and every material element constituting such offense' [was] reversible error" because "the instruction allowed the jury to

deduce [that] the presumption of innocence did not apply to every element of the offense, but only to the elements it deemed material." 989 P.2d 1017, 1037-38 (Okla. Crim. App. 1999). The court acknowledged that the "material allegations" language might be confusing. *Id.* at 1038. But the court rejected the defendant's characterization of the instruction in light of other instructions that set forth the specific elements of the charged offense and made clear that the presumption of innocence carried through all elements of the offense. *Id.* Therefore, according to the court, any error in the instruction was harmless. *Id.* We agree with the Oklahoma court.

Here, the district court instructed the jury on the elements of each of the offenses charged and that the State had the burden to prove those elements. No other instruction or any argument by the parties suggested that the State's burden on any element or offense was less than beyond a reasonable doubt. Absent an instruction advising that it could do so, we are not convinced that the phrase "material element" caused the jury to speculate that it could choose which of the elements should be proven beyond a reasonable doubt and which ones need not be. Taking the instructions as a whole, they sufficiently conveyed to the jury that the State had the burden of proving beyond a reasonable doubt each element of the charged offenses and the phrase "material element" did not signal to the jury that the State carried a lesser burden of proof on any element or charged offense. Although the phrase "material element" is unnecessary because the State must prove all elements of an offense beyond a reasonable doubt, *see Watson v. State*, 110 Nev. 43, 45, 867 P.2d 400, 402 (1994); *State v. Reynolds*, 51 P.3d 684, 686 (Or. Ct. App. 2002) ("In a sense,

the term 'material element' in its legal usage is something of a redundancy. If an allegation is truly an 'element' of a crime, by definition, it is 'material.' But the point of the legislature's use of the term seems clear enough: A 'material element' is one that the state *must* prove to establish the crime charged."), and therefore should be omitted from future instructions, we conclude that the instruction is not so misleading or confusing as to warrant reversal.

### Remaining guilt phase claims

#### Severance

Burnside argues that the district court abused its discretion by refusing to sever his trial from McKnight's and that he was prejudiced as a result of that error in three respects. First, he argues that he was compelled to share peremptory challenges with McKnight despite their disparate goals during jury selection. However, there is no constitutional right to peremptory challenges; they "arise from the exercise of a privilege granted by the legislative authority." *Anderson v. State*, 81 Nev. 477, 480, 406 P.2d 532, 533 (1965). In Nevada, the "legislature has seen fit to treat several defendants, for [the purpose of peremptory challenges], as one party." *Id.*; *see* NRS 175.041. Second, he argues that the evidence against him was marginal compared to that against McKnight. His characterization of the evidence is not borne out by the record. Third, he contends that the joint trial precluded his cross-examination of McKnight's mother, Valerie Freeman, about incriminating statements McKnight made to her and precluded him from cross-examining McKnight about those statements. Freeman's testimony was not of such significance that severance was required, and, as addressed below, McKnight's

statements were not testimonial because they were made in furtherance of a conspiracy. Because nontestimonial statements are not subject to the confrontation clause, *United States v. Figueroa-Cartagena*, 612 F.3d 69, 85 (1st Cir. 2010), Burnside had no constitutional right to cross-examine McKnight about those statements, *see Crawford v. Washington*, 541 U.S. 36, 55-56 (2004). Accordingly, the district court did not abuse its discretion in this regard. *See Chartier v. State*, 124 Nev. 760, 764, 191 P.3d 1182, 1185 (2008) (applying abuse of discretion standard to NRS 174.165(1) severance issue).

*Allegation that a juror was sleeping*

Burnside complains that the district court abused its discretion by not conducting a hearing after being alerted that a juror was sleeping during trial. Defense counsel advised the district court on three occasions during the guilt phase that juror 6 appeared to be sleeping. Each time, the trial judge responded that she had been keeping a close eye on the jurors to ensure that they were paying attention and did not see any of them sleeping. We conclude that Burnside has not shown that the district court abused its discretion by not further investigating his allegation or granting relief. *See United States v. Sherrill*, 388 F.3d 535, 537 (6th Cir. 2004) (reviewing district court's decision in denying defendant's request to interview jury about allegation of sleeping jury for abuse of discretion). As another court has explained, the trial "court's own contemporaneous observations of the juror may negate the need to investigate further by enabling the court to take judicial notice that the juror was not asleep or was only momentarily and harmlessly so." *Samad v. United States*, 812 A.2d 226, 230 (D.C. 2002) (internal quotation marks

omitted); *see also United States v. Carter*, 433 F.2d 874, 876 (10th Cir. 1970) (concluding that where trial judge indicated that she watched subject juror closely and was convinced that juror was not asleep, "[t]he conduct of the juror in open court was a matter of which the trial court had judicial knowledge and could take judicial notice"). Because the trial judge in this case regularly observed the jurors and never saw juror 6 sleeping, there was no need to investigate further. Other circumstances support our conclusion that further investigation was unwarranted: Burnside did not bring the matter to the district court's attention when the juror was believed to be sleeping, but waited until sometime later, and even then he did not explain how long the juror had been sleeping, identify what portions of the trial or critical testimony the juror had missed, specify any resulting prejudice, or request a remedy of any kind. Considering the district court's contemporaneous observations and the totality of the surrounding circumstances, we cannot fault the district court's handling of the situation.

*Annotation and narration of surveillance videotapes*

Burnside argues that the district court abused its discretion by allowing annotations to be made to video surveillance images and by permitting police detectives to narrate the video surveillance tapes as they were played for the jury, describing what the tapes depicted. Burnside complains that the police detectives who identified him as one of the people in the videos had no prior familiarity with him and therefore could not properly identify him and the narration and annotation of the video with his and McKnight's aliases invaded the province of the jury. We conclude that the district court did not abuse its discretion in this regard.

(O) 1947A

The police detectives' testimony that Burnside and McKnight were the individuals in the surveillance videos and the alias annotations were based on other identification evidence that was admitted before the detectives testified. The identification evidence included descriptions of the clothes the men were wearing when the murder occurred and the testimony of Stewart Prestianni, who was familiar with Burnside and McKnight and their aliases. This is not a situation where the detectives independently identified Burnside and McKnight, which would require that they have some prior knowledge or familiarity with the men or were qualified experts in videotape identification. *Cf. Edwards v. State*, 583 So. 2d 740, 741 (Fla. Dist. Ct. App. 1991) (concluding that police officer's testimony that he recognized defendant in videotape of drug sale was inadmissible because there was no showing that officer had prior knowledge or familiarity with defendant or was qualified as expert in videotape identification); *see generally Rossana v. State*, 113 Nev. 375, 380, 934 P.2d 1045, 1048 (1997) (observing that lay witness's opinion testimony concerning identity of person in surveillance photograph is admissible under NRS 50.265 "if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury" (internal quotation omitted)); *State v. Belk*, 689 S.E.2d 439, 443 (N.C. Ct. App. 2009) (concluding that police officer's lay opinion that defendant was depicted in video surveillance was inadmissible because officer was in no better position than jury to identify defendant as person in surveillance video).

The narration of the surveillance videos assisted the jury in making sense of the images depicted in the videos. *Mills v.*

*Commonwealth*, 996 S.W.2d 473, 488-89 (Ky. 1999) (concluding that police officer's narration of crime scene video was admissible because it assisted jury's evaluation of images displayed on videotape, noting that other witnesses had identified defendant and victim in videotape), *overruled in part on other grounds by Padgett v. Commonwealth*, 312 S.W.3d 336, 346-48 (Ky. 2010). The surveillance videos from Mandalay Bay and Jack-in-the-Box were a compilation of several hours of videotape and involved a multitude of cameras and views. Given the complexities of the surveillance cameras and the piecing together of videos from hours of recordings, we conclude that narration of the surveillance videos shown to the jurors assisted them in understanding the evidence and therefore the district court did not abuse its discretion in allowing the narrative testimony. *Accord United States v. Young*, 745 F.2d 733, 761 (2d Cir. 1984) ("Generally speaking, a trial judge has broad discretion in deciding whether or not to allow narrative testimony. We see no reason to apply a different rule here, where the narrative testimony accompanied and explained videotaped evidence." (citations omitted)).

Burnside also argues that the district court erred by refusing to give his proposed written limiting instruction advising jurors that their interpretation of the actions depicted in the videos is controlling, not the interpretation or opinions of the State's witnesses. Considering the instruction given during Detective Ridings' testimony[3] and other

---

[3]During Detective Ridings' testimony, jurors were admonished that he was expressing his opinion as to the content of the Mandalay Bay surveillance video and that they would have the opportunity to review the

*continued on next page . . .*

SUPREME COURT OF NEVADA

(O) 1947A

instructions on matters related to witness credibility and believability, witnesses with special knowledge, and drawing reasonable inferences from the evidence, we conclude that Burnside failed to show that the district court abused its discretion by rejecting his requested instruction. *Jackson v. State*, 117 Nev. 116, 120, 17 P.3d 998, 1000 (2001).

*Identification testimony*

Burnside argues that the district court abused its discretion by admitting the identification testimony provided by the witness who was in the parking lot near the Jack-in-the-Box because her out-of-court descriptions of him were inaccurate and thus her in-court identification of him was unreliable. He also argues that her identification of him from still photographs from the Mandalay Bay video is problematic because the photographs showed only him and McKnight rather than as part of a traditional photographic lineup and the interview where she was shown the still photographs was not recorded so it is unclear whether the interviewing officer used coercive or suggestive tactics to obtain the witness's identification.[4]

---

*. . . continued*

videos in the jury room and draw their own conclusions as to what the video showed. Burnside agreed below that the district court's admonishment was appropriate.

[4]Burnside initially argued in his opening brief that the district court abused its discretion by not compelling the State to disclose the witness's contact information and not complying with the remedies required for nondisclosure of witness information provided in NRS 174.295(2). In his

*continued on next page . . .*

At the time of the shooting, the witness had just finished her shift at a K-mart near the Jack-in-the-Box where Hardwick was shot. As she was walking through the parking lot to her car, she heard four to five gunshots. After calling her boyfriend, the witness noticed a white car pull into the K-Mart parking lot and park near her car. Two men exited the car. The passenger took off a "puffy" black jacket and placed it and a "black police gun" in the car. He was wearing dark denim jeans and a striped shirt with a logo on the back. The witness described him as African American with braided hair, average height, and in his 20s. The driver also took off his jacket. He was wearing dark denim jeans and a light-colored hoodie with some sort of graphic design on it. The witness described the driver as African American with braided hair and in his 20s. The two men conversed and walked and then ran toward the Jack-in-the-Box. The witness went inside K-Mart and called 9-1-1. After placing the 9-1-1 call, she observed the two men running back to the white car.

During the investigation, the witness spoke with police detectives several times, and she was shown two or three photographic lineups. In only one of the photographic lineups was she able to identify the driver of the white car. Subsequently, a police detective showed her still photographs taken from surveillance video. She was "shocked" by the photographs because the clothing worn by one of the men in one of the

---

. . . *continued*

reply brief, he concedes that the State filed a notice of witnesses pursuant to NRS 174.234(1)(a) that included a physical address for the witness.

photographs matched the clothing worn by the passenger in the white car—the man with the gun. In another still photograph, she identified the two men pictured as the men she saw on the night of the shooting because "[t]hey are wearing what I saw that night."

The witness testified three times. At McKnight's preliminary hearing, she identified him as the driver. At Burnside's preliminary hearing, she did not identify him as a suspect in the shooting. At trial, she testified that she recognized Burnside and McKnight as the two men involved in the shooting based on her observations of them in the K-Mart parking lot and her previous court appearances.

Burnside's challenge is primarily focused on inaccuracies or variations in the witness's descriptions and the fact that she never identified him before trial; therefore, her identification testimony should have been excluded as unreliable. We conclude that the district court did not abuse its discretion. Although the witness never identified Burnside as a suspect before trial and her description of the assailants was inconsistent to a degree, her identification of Burnside was based on his attire at the relevant time, not his physical attributes. Her description of Burnside's clothing was corroborated by other witnesses and the video evidence. We conclude that her identification was not so unreliable as to be inadmissible. Any weakness in her identification testimony goes to the weight to be afforded to the testimony rather than its admissibility. *Collins v. State*, 88 Nev. 9, 13, 492 P.2d 991, 993 (1972); *Page v. State*, 88 Nev. 188, 193, 495 P.2d 356, 359 (1972). The jurors were aware of the alleged discrepancies in the witness's identification testimony, as they were the subject of cross-examination, and it was for the jury to determine



what weight to give that testimony. As to the police detective's use of the still photographs rather than a traditional photographic lineup and failure to record the interview, we conclude that Burnside has not demonstrated that those circumstances show that the police detective's methods were unduly suggestive or indicate that he used coercive or suggestive tactics to extract an identification.

*Admission of coconspirator statements*

Burnside argues that the district court abused its discretion by admitting Valerie Freeman's testimony about statements that she heard McKnight make to his mother, Charmaine Simmons. He argues that the testimony was inadmissible hearsay and violated *Bruton v. United States*, 391 U.S. 123 (1968).

Freeman testified about a conversation between McKnight and Simmons that she overheard several days after Hardwick's murder. A crying McKnight told Simmons that he had to leave town and asked her for money and luggage. Simmons then asked Freeman for money and luggage; Freeman refused Simmons' request for luggage but gave her $20 to give to McKnight. Freeman also indicated that she vaguely recalled some discussion between her and Simmons about retrieving Simmons' car—a white Mazda. Freeman further testified that McKnight asked his mother for money and told his mother that he and a friend were at a club when an unidentified man told McKnight that there was "a $5,000 hit on his head." McKnight told his mother that when the unidentified man left the club, McKnight's friend followed the man and killed him.

*Coconspirator statements under NRS 51.035(3)(e)*

Burnside contends that Freeman's testimony about McKnight's statements is hearsay and does not fall under NRS 51.035(3)(e), which provides that "[a] statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. Burnside's argument is focused not so much on whether there was sufficient evidence of a conspiracy as on whether the statements were "in furtherance of the conspiracy."[5] NRS 51.035(3)(e).

McKnight's statements about luggage, money, and retrieving his mother's car suggest that he was attempting to evade capture and conceal evidence (the white Mazda that was captured on the surveillance tapes). Because "[t]he duration of a conspiracy is not limited to the commission of the principal crime, but can continue during the period when coconspirators perform affirmative acts of concealment," *Foss v. State*, 92 Nev. 163, 167, 547 P.2d 688, 691 (1976); *see Crew v. State*, 100 Nev. 38, 46, 675 P.2d 986, 991 (1984), McKnight's efforts to evade capture and conceal evidence were in furtherance of the conspiracy to the extent that getting away with the principal crime is necessarily one of the objectives of a conspiracy. *See Crew*, 100 Nev. at 46, 675 P.2d at 991 (holding that coconspirator's statements to third party relating to his plan

---

[5]Before a coconspirator's statement may be admitted, independent prima facie evidence must establish that a conspiracy existed. *Crew v. State*, 100 Nev. 38, 46, 675 P.2d 986, 991 (1984); *Fish v. State*, 92 Nev. 272, 274-75, 549 P.2d 338, 340 (1976). We conclude that prima facie evidence established a conspiracy between Burnside and McKnight to rob Hardwick.

to move bodies after murder were admissible under NRS 51.035(3)(e) because plan "was intended to avoid detection" and therefore was in furtherance of conspiracy to commit murder); *see also Wood v. State*, 115 Nev. 344, 349, 990 P.2d 786, 789 (1999) (defining when statements to a third party are made in furtherance of a conspiracy). Therefore, we conclude that the challenged statements fall within the scope of NRS 51.035(3)(e).

With regard to McKnight's statements about the $5,000 hit on his head and his friend killing the man who relayed the hit to McKnight, the parties dispute whether these statements were related to this case or another murder involving McKnight. We have observed that "statements made by a co-conspirator to a third party who is not then a member of the conspiracy are in furtherance of the conspiracy only if they are designed to induce that party to join the conspiracy or act in a way that would assist the conspiracy's objectives." *Wood*, 115 Nev. at 349, 990 P.2d at 789. Such statements are not in furtherance of the conspiracy "if they were intended to be nothing more than idle chatter or casual conversation about past events." *United States v. Shores*, 33 F.3d 438, 444 (4th Cir. 1994). "Whether a particular statement to a third party was intended to induce that party to join or assist the conspiracy, hence was 'in furtherance' of it, must be determined by careful examination of the context in which it was made." *Id.* A statement may be in furtherance of a conspiracy "even though it is 'susceptible of alternative interpretations' and was not 'exclusively, or even primarily, made to further the conspiracy,' so long as there is 'some reasonable basis' for concluding that it was designed to

further the conspiracy." *Id.* (quoting *United States v. Shoffner*, 826 F.2d 619, 628 (7th Cir. 1987)).

McKnight's statements about the hit and subsequent killing are susceptible to alternative interpretations. They could be viewed as a conversation about past events simply to explain the situation he faced to his mother rather than to further the objectives of the conspiracy. But when considered in the context of the rest of the conversation with his mother, the statements can reasonably be construed as part of an attempt to get his mother to assist the conspiracy by helping him evade arrest and conceal evidence. Conveying to his mother the gravity of the situation (that someone had been killed, ostensibly to protect McKnight), could have been designed at least in part to convince his mother to help. *Cf. Shores*, 33 F.3d at 444-45 (holding that trial court could reasonably construe coconspirator's statements to cellmate as being designed to induce cellmate, who was long-time criminal with connections to organized crime, to join or provide assistance to conspiracy by fabricating defense and finding someone to kill another conspirator, even though statements also could be construed as "casual conversation about past events" to explain the charges that he faced to his cellmate). We therefore conclude that the statements were admissible under NRS 51.035(3)(e). But even assuming error in their admission, no prejudice resulted because McKnight did not directly implicate Burnside in his statement and there was substantial evidence supporting Burnside's guilt. We therefore conclude that admission of the challenged evidence did not have a substantial influence on the verdict. *See Knipes v. State*, 124 Nev. 927, 935, 192 P.3d 1178, 1183 (2008).

*Bruton*

Burnside also argues that Freeman's testimony about McKnight's statements violated *Bruton*. *Bruton* holds that the admission in a joint trial of a nontestifying codefendant's incriminating statement that expressly refers to the defendant violates the Sixth Amendment Confrontation Clause, even if the jury is instructed to consider the confession only against the nontestifying codefendant. 391 U.S. at 124 & n.1, 126. *Bruton* is premised on the Confrontation Clause. *Id.* at 126. Since *Bruton* was decided, the Supreme Court has held that the Confrontation Clause does not apply to out-of-court statements that are nontestimonial. *Crawford v. Washington*, 541 U.S. 36 (2004). *Bruton* therefore must be viewed "through the lens of *Crawford*." *United States v. Figueroa-Cartagena*, 612 F.3d 69, 85 (1st Cir. 2010). In other words, if the challenged out-of-court statement by a nontestifying codefendant is not testimonial, then *Bruton* has no application because the Confrontation Clause has no application. *See, e.g., United States v. Smalls*, 605 F.3d 765, 768 n.2 (10th Cir. 2010); *United States v. Johnson*, 581 F.3d 320, 326 (6th Cir. 2009); *United States v. Avila Vargas*, 570 F.3d 1004, 1008-09 (8th Cir. 2009); *People v. Arceo*, 125 Cal. Rptr. 3d 436, 446-47 (Cal. Ct. App. 2011); *Thomas v. United States*, 978 A.2d 1211, 1224-25 (D.C. 2009); *State v. Usee*, 800 N.W.2d 192, 197-98 (Minn. Ct. App. 2011).

McKnight's statements are nontestimonial. They were not contained in formalized testimonial materials such as an affidavit, deposition, or prior testimony; were not made to law enforcement in the course of interrogation; and were not made under circumstances that would lead a reasonable person to believe that they would be used

prosecutorially. *See Flores v. State*, 121 Nev. 706, 716-20, 120 P.3d 1170, 1176-80 (2005) (discussing illustrations of testimonial hearsay). Moreover, as explained above, the statements were made in furtherance of a conspiracy and by their very nature are not testimonial. *See Crawford*, 541 U.S. at 56; *see also Avila Vargas*, 570 F.3d at 1009. Therefore, Burnside had no constitutional right to confront McKnight regarding the statements and his *Bruton* challenge lacks merit.

*Evidence supporting robbery and burglary*

Burnside argues that insufficient evidence supports his convictions for robbery with the use of a deadly weapon and burglary. The State charged Burnside with robbery with the use of a deadly weapon as a direct participant, coconspirator, and aider and abettor and with burglary as a direct participant and aider and abettor. Although the evidence indicates that McKnight seized the silver cigar case from Hardwick, the evidence is more than sufficient to establish beyond a reasonable doubt that Burnside was a coconspirator or aider and abettor in the robbery and an aider and abettor in the burglary. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Furbay v. State*, 116 Nev. 481, 486, 998 P.2d 553, 556 (2000); *Doyle v. State*, 112 Nev. 879, 891, 921 P.2d 901, 910 (1996), *overruled on other grounds in Kaczmarek v. State*, 120 Nev. 314, 91 P.3d 16 (2004).

*Robbery as specific intent offense*

Burnside contends that the district court erred by overruling his objection to the robbery and felony-murder instructions on the ground that robbery is a specific intent offense. He recognizes that this court determined in *Litteral v. State*, 97 Nev. 503, 508, 634 P.2d 1226, 1228-29

(1981), *disapproved on other grounds in Talancon v. State*, 102 Nev. 294, 721 P.2d 764 (1986), that robbery is a general intent crime but urges the court to overrule *Litteral* and return robbery to its common law classification as a specific intent offense given the "ambiguity of [NRS 200.380], the common law history, and the rule of lenity." We are not persuaded to retreat from *Litteral*.

Alternatively, Burnside argues that even if robbery is a general intent offense, we should treat it as a specific intent offense when it is used to support a felony-murder charge. The Legislature saw fit to view robbery as involving dangerous conduct that creates a foreseeable risk of death. It is that risk that makes robbery an appropriate felony to support a felony-murder charge. And although felony murder is defined broadly in Nevada given the number of felonies included in the statute, *McConnell v. State*, 120 Nev. 1043, 1065, 102 P.3d 606, 622 (2004), the narrowing function is served by the requirement that the jury find one or more statutory aggravating circumstances before death is available as a sentence for first-degree murder, NRS 200.030(4)(a). *See McConnell*, 120 Nev. at 1066, 102 P.3d at 622. Therefore, robbery as a general intent crime does not offend the constitutional narrowing requirement when used to support a felony-murder theory.

*Instruction on admissibility of coconspirator statement*

Burnside contends that the district court's instruction regarding the jury's consideration of a coconspirator's statements in furtherance of a conspiracy confused and misled the jury to believe that he could be convicted under a conspiracy theory based on slight evidence rather than the constitutionally required beyond-a-reasonable-doubt

SUPREME COURT
OF
NEVADA

(O) 1947A

standard. The instruction solely addresses the jury's consideration of a coconspirator's statements in furtherance of a conspiracy as evidence against another member of the conspiracy, outlining the preconditions to the jury's consideration of the evidence, including slight evidence that a conspiracy existed. *See McDowell v. State*, 103 Nev. 527, 529, 746 P.2d 149, 150 (1987); *Peterson v. Sheriff, Clark Cnty.*, 95 Nev. 522, 524, 598 P.2d 623, 624 (1979). The instruction does not suggest that Burnside may be convicted of conspiracy or a conspiracy theory of liability based on slight evidence instead of the constitutionally required beyond-a-reasonable-doubt standard. And two other instructions advised the jury that the State had to prove Burnside's guilt beyond a reasonable doubt. Accordingly, the district court did not abuse its discretion in overruling Burnside's objection to the instruction. *See Crawford v. State*, 121 Nev. 744, 748, 121 P.3d 582, 585 (2005).

*Penalty hearing claims*

> *Validity of the prior-violent-felony-conviction aggravating circumstance*

Relying on *Hidalgo v. Eighth Judicial District Court*, 124 Nev. 330, 332, 184 P.3d 369, 372 (2008) (holding that solicitation to commit murder is not a felony involving use or threat of violence under NRS 200.033(2)(b)), and *Nunnery v. Eighth Judicial District Court*, 124 Nev. 477, 478, 186 P.3d 886, 886 (2008) (holding that conspiracy to commit robbery is not a felony involving use or threat of violence to another under NRS 200.033(2)(b)), Burnside argues that an attempt offense, in this case attempted battery with substantial bodily harm, is not a violent felony for the purposes of NRS 200.033(2)(b) and therefore the prior-violent-felony-conviction aggravating circumstance is invalid. He also argues that

insufficient evidence was introduced pursuant to *Redeker v. Eighth Judicial District Court*, 122 Nev. 164, 127 P.3d 520 (2006), to prove the aggravating circumstance.

We have acknowledged or upheld an aggravating circumstance under NRS 200.033(2)(b) based on a conviction of an attempt to commit a crime of violence. *See, e.g., Nunnery v. State*, 127 Nev., Adv. Op. 69, 263 P.3d 235, 260 (2011) (concluding that evidence of two attempted murder convictions and attempted robbery conviction supported prior-violent-felony-conviction aggravating circumstance); *Thomas v. State*, 122 Nev. 1361, 1375, 148 P.3d 727, 736 (2006) (concluding that prior-violent-felony-conviction aggravating circumstance under NRS 200.033(2)(b) was proved by admission of judgment of conviction for attempted robbery); *Rhyne v. State*, 118 Nev. 1, 13, 38 P.3d 163, 171 (2002) (upholding prior-violent-felony-conviction aggravating circumstance based on conviction for attempted assault with deadly weapon); *accord Oats v. Singletary*, 141 F.3d 1018, 1031 (11th Cir. 1998) (concluding that second-degree attempted murder constitutes prior violent felony supporting aggravating circumstance that defendant was previously convicted of "felony involving the use or threat of violence to the person" (internal quotation marks omitted)); *Winkles v. State*, 894 So. 2d 842, 847 (Fla. 2005) (upholding prior-violent-felony aggravating circumstance based on attempted robbery conviction). However, we have not expressly taken up the question of whether an attempt to commit a violent crime satisfies NRS 200.033(2)(b).

Burnside equates an attempt offense with the offenses of solicitation and conspiracy. His argument is essentially this: Like

solicitation and conspiracy, attempt offenses are inchoate offenses that can be committed without the infliction of violence or an explicit threat of violence, and therefore, attempt offenses cannot satisfy NRS 200.033(2)(b). Although Burnside correctly characterizes attempt as an inchoate offense, attempt is distinguishable from solicitation and conspiracy. We reasoned in *Hidalgo* and *Nunnery* that solicitation to commit murder and conspiracy to commit robbery, respectively, do not satisfy NRS 200.033(2)(b) because those offenses do not involve the use or threat of violence against another, regardless of the purpose of the solicitation or conspiracy. *Hidalgo*, 124 Nev. at 334-35, 184 P.3d at 373; *Nunnery*, 124 Nev. at 480, 186 P.3d at 888. Solicitation is a crime of communication, that is, "the harm is the asking—nothing more need be proven." *Hidalgo*, 124 Nev. at 334-35, 184 P.3d at 373 (internal quotations omitted). Similarly, the crime of conspiracy is "committed upon reaching the unlawful agreement," and nothing more needs to be proven. *Nunnery*, 124 Nev. at 480, 186 P.3d at 888-89 (internal quotation marks omitted); *see* NRS 199.490 (providing that proof of an overt act is not necessary to show conspiracy). Unlike solicitation and conspiracy, attempt requires "performance of an overt act toward the commission of the crime." *Johnson v. Sheriff, Clark Cnty.*, 91 Nev. 161, 163, 532 P.2d 1037, 1038 (1975); *Larsen v. State*, 86 Nev. 451, 453, 470 P.2d 417, 418 (1970); *see* NRS 193.330(1) (defining attempt as "[a]n act done with the intent to commit a crime, and tending but failing to accomplish it"); *Riebel v. State*, 106 Nev. 258, 260, 790 P.2d 1004, 1006 (1990) ("Mere preparation is insufficient to prove an attempt to commit a crime."). It is that critical distinction that sets attempt apart from solicitation and conspiracy

Supreme Court
of
Nevada

(O) 1947A

because the overt act, in the context of an attempt to commit a violent crime, might involve the use or threat of violence. *See generally Weber v. State*, 121 Nev. 554, 586, 119 P.3d 107, 129 (2005) (acknowledging that use or threat of violence often occurs in sexual assault but neither is element of offense and upholding prior-violent-felony-conviction aggravating circumstance where trial record reflected no evidence of overt violence or threats by defendant against victim during two sexual assaults but showed that victim experienced trauma and violence during defendant's first sexual assault of her and totality of evidence was sufficient to support inference that both sexual assaults included at least implicit threats of violence). We therefore conclude that attempt offenses should not be excluded from the purview of NRS 200.033(2)(b) as a matter of law.

To determine whether a particular attempt offense satisfies NRS 200.033(2)(b), we must look at the overt act and determine whether the State sufficiently proved that the overt act involved the use or threat of violence. In doing so, the State is limited in the evidence that can be used to establish that an offense involves the use or threat of violence. *Redeker*, 122 Nev. 164, 127 P.3d 520. In *Redeker*, we concluded that where it is not readily apparent from the statutory elements that an offense involves the use or threat of violence, the fact-finder may look beyond the statutory elements to determine whether the prior offense involved the use or threat of violence for purposes of NRS 200.033(2)(b). 122 Nev. at 172, 127 P.3d at 525-26. However, the type of evidence that can be considered in making that determination is not limitless. *Id.* Where the prior conviction at issue is based on a guilty plea, the fact-

finder may consider the statutory definition of the offense, "charging document[s], written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented" underlying the prior conviction to determine whether the offense involved the use or threat of violence for purposes of NRS 200.033(2)(b). *Id.* at 172, 127 P.3d at 525 (internal quotation marks omitted); *see Hidalgo*, 124 Nev. at 335-36, 184 P.3d at 374.

With this backdrop, we turn to the question of whether the State proved beyond a reasonable doubt that Burnside's conviction for attempted battery with substantial bodily harm satisfied NRS 200.033(2)(b). The State introduced the preliminary hearing testimony of Tyyanna Clark, who explained that Burnside attacked her by hitting, punching, and kicking her, breaking her jaw and eye bones. However, preliminary hearing testimony is not the type of evidence identified in *Redeker* as competent evidence to show that the offense involved the use or threat of violence. The State also introduced exhibit 257, which contained information related to Burnside's juvenile and adult history, including the judgment of conviction for the attempted battery of Clark but no other related documents that referenced him. The judgment of conviction does not include any information indicating that the attempted battery involved the use or threat of violence. The other documents related to that offense in exhibit 257—another judgment of conviction, a guilty plea agreement, and two copies of a charging document—involve Burnside's brother, Tommie, who participated in the attack on Clark. Because the State did not introduce evidence consistent with *Redeker* to establish that Burnside's conviction for the attempted battery of Clark

involved the use or threat of violence, the prior-violent-felony aggravating circumstance was not proved and therefore must be struck.

We must now determine whether Burnside's death sentence can be upheld in the absence of the prior-violent-felony aggravating circumstance. *Archanian v. State*, 122 Nev. 1019, 1040, 145 P.3d 1008, 1023 (2006) ("A death sentence based in part on an invalid aggravator may be upheld either by reweighing the aggravating and mitigating evidence or conducting a harmless-error review."); *see Clemons v. Mississippi*, 494 U.S. 738, 741 (1990). Because the felony aggravating circumstance based on robbery is valid and the jury found no mitigating circumstances, Burnside remains death eligible, *see* NRS 200.030(4)(a), and the invalid aggravating circumstance would not have affected the jury's weighing of the aggravating and mitigating circumstances. And although Burnside's conviction for attempted battery with substantial bodily injury cannot be used as an aggravating circumstance, it was admissible as other matter evidence under NRS 175.552(3) and therefore was properly considered by the jury in selecting the appropriate sentence for Hardwick's murder. For these reasons, the invalid aggravating circumstance does not warrant reversal of the death sentence.[6]

---

[6]Because the prior-violent-felony aggravating circumstance is invalid, we need not address Burnside's other challenges to that aggravating circumstance.

SUPREME COURT
OF
NEVADA

(O) 1947A

*Remaining penalty hearing claims*

*District court's refusal to bifurcate the penalty hearing*

Burnside argues that the district court abused its discretion by denying his motion to bifurcate the penalty hearing. We have refused to require bifurcated proceedings in capital penalty hearings, *see, e.g., McConnell v. State*, 120 Nev. 1043, 1061-62, 102 P.3d 606, 619 (2004); *Gallego v. State*, 117 Nev. 348, 369, 23 P.3d 227, 241 (2001), *abrogated on other grounds by Nunnery v. State*, 127 Nev., Adv. Op. 69, 263 P.3d 235 (2011), and Burnside offers no novel argument justifying a fresh look at our jurisprudence in this area.

*Evidence that Burnside was a pimp*

Burnside complains that the district court abused its discretion by admitting a statement suggesting that he was a pimp because the statement was vague and unsupported by the evidence. Although the statement was impalpable given its ambiguity, *see Sherman v. State*, 114 Nev. 998, 1012, 965 P.2d 903, 913 (1998), it was brief and did not have a substantial influence on the jury's sentencing determination, *see Kotteakos v. United States*, 328 U.S. 750, 776 (1946) (considering whether error "had substantial and injurious effect or influence in determining the jury's verdict" when reviewing nonconstitutional error); *see also* NRS 178.598 (harmless error rule), considering Burnside's significant criminal history.

*Admission of gang evidence*

Burnside argues that the district court improperly admitted evidence that he was affiliated with a gang because there was no suggestion that Hardwick's murder was gang-related and the State failed

to provide notice of its intent to introduce the evidence. Because Burnside failed to object below, we review for plain error affecting his substantial rights. NRS 178.602; *Archanian v. State*, 122 Nev. 1019, 1031, 145 P.3d 1008, 1017 (2006). Relying on *Dawson v. Delaware*, 503 U.S. 159 (1992), in *Lay v. State*, we concluded that "[e]vidence of affiliation with a particular group is only relevant at the penalty phase of a criminal trial when membership in that group is linked to the charged offense, or is used as other than general character evidence." 110 Nev. 1189, 1196, 886 P.2d 448, 452 (1994). Some of the documents admitted during the penalty phase refer to an offense or action that was gang-related, and a police detective testified that Burnside's criminal history included an incident where Burnside defaced private property and that the offense was gang-related. Admission of this evidence was not plain error as the gang references were integral to the criminal activities described and those activities are relevant to the jury's capital sentencing determination. *See id.* (concluding that evidence concerning "prior offenses or acts committed in connection with the gang" was relevant at capital sentencing hearing as it showed that defendant "had a violent disposition"). In contrast, some documents made general references to Burnside's affiliation with gangs. That evidence falls into the category of general character evidence and therefore was inadmissible. But in light of Burnside's lengthy criminal history and the gang connection relevant to some of that history, we conclude that the error did not affect his substantial rights. Nor has he established plain error related to notice as the State provided notice that it would introduce evidence of his juvenile criminal history.

*Admission of statement in presentence investigation report*

Burnside contends that the district court abused its discretion by admitting the presentence investigation report (PSI) related to his prior felony conviction for battery with substantial bodily harm because it was confidential and included prejudicial information such as gang references, his alleged monikers, and several charges that were later dismissed. Because Burnside did not object below, we review for plain error affecting his substantial rights. NRS 178.602; *Archanian*, 122 Nev. at 1031, 145 P.3d at 1017. He has not demonstrated plain error for two reasons. First, as Burnside acknowledges, we concluded in *Nunnery v. State* that the use of PSI reports in capital penalty hearings does not violate the general confidentiality provisions in NRS 176.156. 127 Nev., Adv. Op. 69, 263 P.3d at 249. Second, although he argues that he was prejudiced by the admission of the PSI report, he does not contend that any information in it was impalpable or highly suspect. *Nika v. State*, 124 Nev. 1272, 1296, 198 P.3d 839, 856 (2008) (stating that evidence of uncharged prior bad acts is admissible in capital penalty hearing if not impalpable or highly suspect).

*Admission of photograph of appellant holding an assault rifle*

Burnside complains that the district court erred by admitting a photograph of him holding an assault rifle because its admission violated his constitutional right to bear arms and the photograph was irrelevant and unfairly prejudicial. Burnside failed to raise the constitutional issue below, and we conclude that he has not demonstrated plain error. *See* NRS 178.602; *Archanian*, 122 Nev. at 1031, 145 P.3d at 1017. And although we conclude that the photograph was of dubious

relevance, any error was harmless. *See* NRS 178.598; *see also Kotteakos*, 328 U.S. at 776-77. Accordingly, no relief is warranted on this claim.

*Juvenile delinquency records*

Burnside argues that the State improperly received his sealed juvenile records, the juvenile court erred in providing the records to the State, and the district court erred by admitting those records during the penalty hearing. He further contends that he was prejudiced by their admission because the records admitted were extensive and the State relied heavily on them in its closing arguments. Because he did not object to the release of his juvenile records to the State or the district court's admission of them, we review his claim for plain error affecting his substantial rights. NRS 178.602; *Archanian*, 122 Nev. at 1031, 145 P.3d at 1017. We conclude that Burnside cannot establish plain error for the following reasons.

First, this appeal is from the judgment of conviction. We can only review matters that appear in the trial record. The trial court's order did not release the juvenile records to either party, and, in fact, the court recognized that it lacked jurisdiction to do so. And while the order indicates that both parties should be provided the records, the trial court also directed that its order would be "submitted with the Juvenile Court Order for the records to be released to the parties under the applicable guidelines." It is apparent that the trial court recognized that any release of records would be accomplished in accordance with applicable rules. Any error in releasing the records does not rest with the trial court but rather the juvenile court if in fact it entered an order releasing the records, which is not apparent from the trial record.

Second, although Burnside represents that the juvenile court clearly provided the State with copies of or granted the State access to the juvenile records, the trial record suggests that the State obtained the juvenile records from the defense. In particular, the trial record includes a receipt sent by the defense to the State in which the State acknowledged "RECEIPT of a copy of the juvenile records of Defendant Burnside" on April 28, 2009. The receipt does not identify what documents were included in the copy provided by the defense, but it indicates that Burnside turned over some or all of the juvenile records to the State. To the extent that the defense disclosed the records, Burnside cannot now complain. *See State v. Gomes*, 112 Nev. 1473, 1480, 930 P.2d 701, 706 (1996) (providing that error in admitting evidence was not reversible where defense invited error); *Ybarra v. State*, 103 Nev. 8, 16, 731 P.2d 353, 358 (1987) (same); *Milligan v. State*, 101 Nev. 627, 637, 708 P.2d 289, 296 (1985) (same). But in any event, we cannot say from the record before us that the State improperly obtained the juvenile records.

Third, although several documents in Burnside's juvenile records are marked confidential or are stamped "Use and Dissemination of this Record is regulated by Law," none of the juvenile records are identified as sealed. Therefore, Burnside's supposition that the juvenile records admitted at the penalty hearing were sealed is not borne out by the trial record. In fact, a review of the law governing the sealing of juvenile records suggests that the records may not have been sealed. First, Burnside does not allege that he or a probation officer petitioned for his records to be sealed before he turned 21 and the record before us does not demonstrate that Burnside's juvenile records were sealed before he

turned 21 as permitted under NRS 62H.130. Second, there is an exception to the general rule that "when a child reaches 21 years of age, all records relating to the child must be sealed automatically," NRS 62H.140, which may have prevented the automatic sealing of some, if not all, of Burnside's juvenile records before he turned 30 years of age (he was not yet 30 at the time of the trial in this case). In particular, if a child is adjudicated delinquent for "[a]n unlawful act which would have been a felony if committed by an adult and which involved the use or threatened use of force or violence," NRS 62H.150(6)(b), and the records relating to that act were not sealed by the juvenile court before the child reached 21 years of age, as provided in NRS 62H.130, then the "records must not be sealed before the child reaches 30 years of age," NRS 62H.150(1). Because it appears that Burnside was adjudicated delinquent for robbery, which would have been a felony if committed by an adult and involved the use or threatened use of force or violence, and he was not yet 30 years of age when the records were disclosed, it seems unlikely that his juvenile records related to the robbery offense had been sealed. While his juvenile records relating to other criminal activity may not have satisfied NRS 62H.150(6), we cannot say that admission of that evidence constituted plain error given the state of the record before us.

Plain error requires that "an error must be so unmistakable that it is apparent from a casual inspection of the record." *Garner v. State*, 116 Nev. 770, 783, 6 P.3d 1013, 1022 (2000), *overruled on other grounds by Sharma v. State*, 118 Nev. 648, 56 P.3d 868 (2002), *and by Nika v. State*, 124 Nev. 1272, 198 P.3d 839 (2008). We simply cannot discern on this record, where no objection was voiced and therefore the necessary record

SUPREME COURT
OF
NEVADA

(O) 1947A

was not developed, that the State improperly obtained Burnside's juvenile records or that the district court erred in admitting them.[7]

*Admission of evidence purportedly not included in the State's notice of evidence in aggravation*

Burnside argues that the district court erred by admitting evidence that was not included in the State's notice of evidence in aggravation. Because he did not object, his claim is reviewed for plain error affecting his substantial rights. NRS 178.602; *Archanian*, 122 Nev. at 1031, 145 P.3d at 1017. First, Burnside argues that the district court erroneously allowed Hardwick's girlfriend to testify that she had attended all court appearances in the case and had been subjected to ridicule during those appearances because the State's notice of evidence in aggravation did not reveal that the State intended to elicit misconduct allegedly committed by him or McKnight during court proceedings. The challenged comments were spontaneous and unsolicited, and we conclude that he has not demonstrated plain error.[8] Second, he argues that the State provided no notice of Detective Benjamins' testimony concerning statements by a witness who observed two African-American men sitting in a car after the shooting, laughing, gesturing with their hands, and saying "woo, woo,

---

[7]We have not addressed *Clay v. Eighth Judicial Dist. Court*, 129 Nev., Adv. Op. 91, 313 P.3d 232 (2013), cited by Burnside, because that opinion has been withdrawn.

[8]We further conclude that Burnside failed to establish plain error respecting the testimony of Hardwick's girlfriend on the ground that it exceeded the scope of permissible victim-impact evidence given the spontaneous and brief nature of the challenged comments.

woo" (siren noises). Even assuming that this evidence should have been noticed, considering other evidence showing the senseless and calculated nature of the murder, we conclude that he has not established plain error.

*Prosecutorial misconduct*

Burnside argues that the prosecutor committed misconduct in two instances. First, he contends that the prosecutor misrepresented to the jury that McKnight was not eligible for the death penalty and that he was prejudiced by the misrepresentation because the jury rejected his proffered mitigating circumstances related to the fact that McKnight was not facing the death penalty and had another unrelated murder charge pending. Because he failed to object, this court reviews for plain error. NRS 178.602; *Archanian*, 122 Nev. at 1031, 145 P.3d at 1017. Whether the prosecutor's statement that McKnight was not subject to the death penalty was incorrect as a matter of law is unclear as his eligibility for the death penalty depended on the availability of aggravating circumstances, *see* NRS 200.030, and whether the jury found him guilty of premeditated murder or felony murder or both, *see McConnell v. State*, 120 Nev. 1043, 1069, 102 P.3d 606, 624 (2004). To the extent that the challenged comment was incorrect, we conclude that Burnside has not shown that it affected his substantial rights or induced the jury to reject his proffered mitigating circumstance. Second, he argues that during closing argument, the prosecutor improperly argued that the jury would give value to Hardwick's life and compensation to his family by returning a death sentence. We conclude that the challenged comments, considered in context, merely pointed out the senseless nature of the murder, highlighted the damage Hardwick's murder inflicted on his family, and

entreated the jury to impose a death sentence. The comments were not improper.

*Validity of robbery aggravating circumstance*

Burnside argues that the robbery aggravating circumstance is invalid because there was no evidence proving that he "was in any way involved in McKnight's decision to take the cigar case or otherwise take property from Hardwick" and liability for the robbery cannot be imputed to him, as imputed liability is not provided for in NRS 200.033. We disagree. NRS 200.033(4) applies where "[t]he murder was committed while the person was engaged, *alone or with others*, in the commission of, or an attempt to commit or flight after committing or attempting to commit" certain felonies, including robbery. (Emphasis added.) The plain language of the statute contemplates the situation presented here where the evidence shows that Burnside and McKnight acted in concert to rob Hardwick.[9]

---

[9]To the extent Burnside argues that the State presented hearsay evidence to support the aggravating circumstance, our decision in *Summers v. State*, 122 Nev. 1326, 1327, 148 P.3d 778, 779 (2006), allows for the admission of hearsay in capital penalty hearings. And we have affirmed *Summers'* holding in challenges to the admission of hearsay evidence related to the eligibility prong of Nevada's death penalty scheme. *See, e.g., Thomas v. State*, 122 Nev. 1361, 1367, 148 P.3d 727, 732 (2006); *Johnson v. State*, 122 Nev. 1344, 1353, 148 P.3d 767, 773 (2006). We are not persuaded to alter our course in this regard. *See Miller v. Burk*, 124 Nev. 579, 597, 188 P.3d 1112, 1124 (2008) ("[U]nder the doctrine of *stare decisis*, we will not overturn [prior decisions] absent compelling reasons for so doing." (footnote omitted)).

*Mitigation instruction*

Burnside complains that the definition of mitigation was incomplete and that the term "moral culpability" used in the instruction was confusing and unconstitutionally vague because a reasonable juror would not understand that phrase to mean that any factor, "whether or not associated with the underlying offense," could be considered as mitigation. He contends that the prejudicial effect of the phrase was exacerbated by the prosecutor's arguments minimizing the importance of mitigation and erroneous suggestions that mitigation must be related to the underlying offense, as evidenced by the jury's failure to find a single mitigating circumstance.

The instruction used in this case is the same instruction that we recently considered in *Watson v. State*, 130 Nev., Adv. Op. 76, 335 P.3d 157 (2014). In that case, we concluded that there was no "reasonable likelihood that the jury misunderstood the . . . instruction to preclude it from considering any aspect of [a defendant's] character or record as a mitigating circumstance regardless of whether it reflected on his moral culpability." *Id.* at 173. We reach the same conclusion here. Considerable time was spent presenting mitigation evidence that was unrelated to the circumstances of the offense; the bulk of Burnside's mitigation evidence centered on his upbringing and the hardships he encountered during his childhood. Consistent with that presentation, the jury was given a verdict form listing 17 proposed mitigating circumstances, 14 of which related to his background, family circumstances, and character. It is not reasonably likely that the jury thought that it could not consider all of the mitigation evidence that had been presented or that it had been given a verdict form

Supreme Court
of
Nevada

(O) 1947A

that included mitigating circumstances that it was not permitted to consider. That the jury did not find any mitigating circumstances does not in itself signal that the jury believed it was precluded from considering Burnside's background, character, and other circumstances unrelated to the offense. Rather, it is just as likely that the jurors were not persuaded that the proffered mitigating circumstances would justify a sentence less than death. And nothing in the prosecutor's arguments suggested to the jury that it could not consider evidence of Burnside's character and record. For these reasons, as in *Watson*, we conclude that Burnside is not entitled to relief based on this instruction.

### Weighing equation

Burnside argues that the jurors were improperly instructed on the weighing of mitigating and aggravating circumstances because that determination is a finding of fact that is necessary to make death an available sentence and therefore that weighing is subject to the beyond-a-reasonable-doubt standard under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002). We held in *Nunnery v. State*, 127 Nev., Adv. Op. 69, 263 P.3d 235, 241, 250-53 (2011), that the weighing of aggravating and mitigating circumstances "is not a factual finding that is susceptible to the beyond-a-reasonable-doubt standard of proof" and therefore is not subject to *Apprendi* and *Ring*. Accordingly, Burnside's claim lacks merit.

### Jury's failure to find mitigating circumstances

Burnside contends that the jury's failure to find any mitigating circumstances, despite clear and uncontroverted evidence, violated several of his constitutional rights. While he presented evidence

to support each of the 17 mitigating circumstances he proffered, the jury is not obligated to find a mitigating circumstance merely because unrebutted evidence supports it. *See Gallego v. State*, 117 Nev. 348, 366-67, 23 P.3d 227, 240 (2001), *abrogated on other grounds by Nunnery*, 127 Nev., Adv. Op. 69, 263 P.3d at 235; *Thomas v. State*, 114 Nev. 1127, 1149, 967 P.2d 1111, 1125 (1998). Burnside urges us to overrule *Gallego* because it is contrary to federal constitutional authority that requires jurors to consider mitigation. *Gallego* does not hold that the jury may ignore mitigation. "It is well established that the sentencer in a capital case must consider all mitigating evidence presented by the defense." *Thomas*, 114 Nev. at 1149, 967 P.2d at 1125; *see Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1982) (noting that sentencer may determine weight to be given mitigation evidence, but it "may not give it no weight by excluding such evidence from [its] consideration"). Nothing in the record suggests that the jury ignored the evidence, and we see no basis to depart from our conclusion that the weight given to mitigation evidence, even if unrebutted, rests with the jury.

### Constitutionality of the death penalty

Burnside argues that the death penalty is unconstitutional on three grounds, all of which this court has previously rejected: (1) the death penalty scheme does not genuinely narrow the class of defendants eligible for death, *see Nunnery*, 127 Nev., Adv. Op. 69, 263 P.3d at 257; *Leonard v. State*, 117 Nev. 53, 82-83, 17 P.3d 397, 415-16 (2001); (2) death constitutes cruel and unusual punishment, *see Gallego*, 117 Nev. at 370, 23 P.3d at 242; *Colwell v. State*, 112 Nev. 807, 814-15, 919 P.2d 403, 408 (1996); *Shuman v. State*, 94 Nev. 265, 269, 578 P.2d 1183, 1186 (1978); and

SUPREME COURT
OF
NEVADA

(O) 1947A

(3) executive clemency is unavailable, *see Nunnery*, 127 Nev., Adv. Op. 69, 263 P.3d at 257; *Colwell*, 112 Nev. at 812, 919 P.2d at 406-07. He has offered no novel or persuasive argument worthy of deviating from this court's firm posture on those matters.

*Cumulative error*

Burnside argues that cumulative error requires reversal of his convictions and death sentence. "The cumulative effect of errors may violate a defendant's constitutional right to a fair trial even though errors are harmless individually." *Hernandez v. State*, 118 Nev. 513, 535, 50 P.3d 1100, 1115 (2002). As to the guilt phase, because Burnside demonstrated a single error—the district court erred by concluding that the testimony relating to cell phone transmissions did not constitute expert testimony, thus requiring the State to provide notice of the witness as an expert—there are not multiple errors to cumulate. *McKenna v. State*, 114 Nev. 1044, 1060, 968 P.2d 739, 749 (1998) (concluding that sole error "does not, by itself, constitute cumulative error"). And while his penalty hearing was not free from error, we conclude that any errors considered cumulatively did not result in an unfair penalty hearing.

*Mandatory appellate review of the death sentence*

NRS 177.055(2) requires that this court review every death sentence and consider whether (1) sufficient evidence supports the aggravating circumstances found; (2) the verdict was rendered under the influence of passion, prejudice or any other arbitrary factor; and (3) death sentence is excessive. First, as explained above, the prior-violent-felony aggravating circumstance is invalid because the State failed to prove beyond a reasonable doubt that Burnside's conviction for attempted

battery with substantial bodily harm involved the use or threat of violence under NRS 200.033(2)(b), but the felony aggravating circumstance based on robbery was proved through evidence presented during the guilt phase of trial. Second, nothing in the record indicates that the jury acted under any improper influence in imposing death. Third, the death sentence is not excessive. The crime was carefully considered—Burnside, along with McKnight, observed and followed Hardwick for a considerable time. The evidence indicated that Burnside shot Hardwick a number of times and that he acted in a calculated, cold-blooded manner and was not provoked (in fact, the evidence suggests that Hardwick had no warning of the impending shooting and robbery). And Burnside's criminal record disclosed multiple instances of violence. His attack on Tyyanna Clark in particular demonstrates that Burnside is a dangerous and violent man. During the attack on Clark, Burnside demanded money, hit her with his fists and feet, stomped on her face, dragged her along the ground, threw her onto a car, and pulled her pants down. Clark suffered a broken jaw and broken eye bone. We recognize that Burnside presented credible mitigation evidence revealing a somewhat troubled childhood, but that evidence does not diminish the calculated, cold-blooded, and unprovoked killing of Hardwick or Burnside's propensity toward violent behavior. Under the circumstances, we conclude that based on the crime and the defendant before us, the death sentence is not excessive. *See generally Dennis v. State*, 116 Nev. 1075, 1084-87, 13 P.3d 434, 440-42 (2000) (discussing and applying excessiveness analysis).

Because review of this appeal reveals no errors that warrant reversal of Burnside's convictions or death sentence, we affirm the judgment of conviction.

_____, J.
Gibbons

We concur:

_____, C.J.
Hardesty

_____, J.
Parraguirre

_____, J.
Douglas

_____, J.
Pickering

SUPREME COURT
OF
NEVADA

(O) 1947A

CHERRY, J., dissenting:

I dissent. I would reverse the judgment of conviction and remand this matter to the district court for a new penalty hearing based on the erroneous instruction given to the jury concerning the definition of mitigating circumstances. The jury received the same erroneous instruction at issue in our decision in *Watson v. State*, 130 Nev., Adv. Op. 76, 335 P.3d 157 (2014). As I observed in that case, the instruction "is simply inconsistent with the statutory language defining mitigating circumstances" because the statute reflects a broader "definition of mitigating circumstances [that] includes facts concerning the defendant or any other circumstance that the jury might find mitigating." *Id.* at 177 (Cherry and Saitta, JJ., dissenting). Because of this disconnect between the instruction and the mitigation statute, NRS 200.035, the instruction likely confused the jury and improperly limited its consideration of mitigating evidence. *Id.* at 177-78. In *Watson*, the instruction was particularly problematic because the jury found no mitigating circumstances despite the presentation of evidence showing that Watson suffered from mental illness and received psychiatric treatment. *Id.* at 178-79.

All of the concerns that I expressed in *Watson* apply with equal force in this case. The jury was presented with compelling mitigation evidence. Burnside lived with a loving aunt until her death when he was eight years old. While living with her, Burnside was a very happy child and attended church and a local Catholic school. His aunt's death left him devastated, and he became aggressive and hard to handle. As a result, Burnside was shuffled from one relative to another. Family members related that he was smart and a good student in school. He

wanted to live with his mother and struggled to understand why he did not live with her when all of his siblings resided with her. Like many of his family members, Burnside became involved in drugs and alcohol. Though the jury was presented with 17 mitigating circumstances related to this evidence, largely centered on the lack of parental involvement in his upbringing, the trauma of losing his beloved aunt, his exposure to criminals and violence at an early age, his separation from his siblings and his status as a victim of violence, and the present support of his family, the jury found none of the mitigating circumstances proffered.

In my view, Burnside's efforts to convince the jury that he deserved a sentence less than death were thwarted by a mitigation instruction that likely led the jurors to believe that evidence of his troubled childhood was immaterial to their sentencing determination. Dismissing the jury's rejection of the proffered mitigating circumstances simply as an indicator of the quality of the mitigation case presented, as the majority does here, ignores the significant flaw in the mitigation instruction. That conclusion also ignores a critical constitutional precept—"[t]he Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence," *Boyde v. California*, 494 U.S. 370, 378-79 (1990), which encompasses any aspect of the defendant's character and record *in addition to* the circumstances of the offense, *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see Browning v. State*, 124 Nev. 517, 526, 188 P.3d 60, 67 (2008) (observing that focus of capital penalty hearing is defendant's character, record, and circumstances of offense); *McKenna v. State*, 114 Nev. 1044, 1052, 968 P.2d 739, 744 (1998) ("[A] defendant's character and record are relevant to the jury's determination of the appropriate sentence for a capital crime.").

Justice demands clear, constitutionally sound instruction to guide the jury's discretion in imposing punishment in a capital case, and justice dictates more than mere conjecture concerning the effect of a confusing and inaccurate mitigation instruction. As in *Watson*, there is a reasonable likelihood that the instruction prevented the jury from considering relevant mitigation evidence in this case and therefore a new penalty hearing is required.

Although the mitigation instruction is by far the most troubling error committed in this case, I believe that three other matters reinforce the need for a new penalty hearing. In particular, two pieces of evidence were erroneously admitted—a statement suggesting that Burnside was a pimp and a photograph of him holding an assault rifle. This evidence was impalpable and irrelevant. Additionally, the prosecutor's argument that McKnight was not eligible for the death penalty was gratuitously misleading and possibly led to the jurors' rejection of Burnside's proffered mitigating circumstance that McKnight was not facing the death penalty. While standing alone these errors are insufficient to warrant a new penalty hearing, the admission of irrelevant and impalpable evidence, further painting Burnside as a bad person, and misleading argument served to highlight the imbalance in the proceedings created by an improper instruction that likely led the jury to disregard the bulk of his mitigation evidence.

The cumulative effect of the errors identified above is further amplified by the particular nature and circumstances of the murder in this case. All first-degree murders are appalling and that is true here as well. However, the death penalty is reserved for those defendants who are characterized as the "worst of the worst." *See Roper v. Simmons*, 543 U.S.

551, 568 (2005) ("Capital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution'" (quoting *Atkins v. Virginia*, 536 U.S. 304, 319 (2002))). Something about the crime or Burnside's character must propel him to the level of the "worst of the worst." The murder here involved a robbery where the victim was shot and killed. The facts and circumstances are not especially egregious or shocking on the spectrum of death penalty cases. That the facts and circumstances created a less than compelling call for the death penalty heightens the impact of the errors committed and resulted in a penalty hearing where Burnside was hampered in his efforts to counter the prosecution's entreaty to the jury that a death sentence was justified in this instance.

All of these elements—the flawed mitigation instruction, the admission of irrelevant and impalpable evidence, the prosecutor's misleading argument, and the weak evidentiary support for a death sentence—combined to produce an unfair penalty hearing. Therefore, I would remand this case for a new penalty hearing. *Hernandez v. State*, 118 Nev. 513, 535, 50 P.3d 1100, 1115 (2002) ("The cumulative effect of errors may violate a defendant's constitutional right to a fair trial even though errors are harmless individually.").

Finally, the Sixth Amendment to the United States Constitution guarantees criminal defendants the right to a trial by a fair and impartial jury. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). A sleeping juror strikes at the heart of a defendant's constitutional right to a fair trial. *See United States v. McKeighan*, 685 F.3d 956, 973 (10th Cir. 2012) (observing that "[a] defendant could be deprived of the Fifth Amendment

right to due process or the Sixth Amendment right to an impartial jury if jurors fall asleep and are unable to fairly consider the defendant's case"). Although Burnside's claim concerning a sleeping juror does not require reversal in this instance, I remind district court judges to tread carefully in this area and take every precaution to fully explore a claim that a juror is sleeping during proceedings.

_____, J.
Cherry

SAITTA, J., dissenting:

I dissent. For the reasons expressed in my dissent in *Watson v. State*, 130 Nev., Adv. Op. 76, 335 P.3d 157 (2014), regarding the erroneous mitigation instruction—the same instruction given here, I would reverse the judgment of conviction and remand this matter to the district court for a new penalty hearing. As I observed in *Watson*, there is a significant disconnect between the instruction and the broad definition of mitigation articulated in NRS 200.035. Here, as in *Watson*, that disconnect likely confused the jury and improperly limited its consideration of the mitigating evidence presented. In a case where the circumstances of the murder make the death penalty a close call, the jury's rejection of all 17 of Burnside's mitigating circumstances notwithstanding the compelling mitigation evidence introduced exposes the prejudicial impact of a flawed mitigation instruction. Because there is a reasonable likelihood the instruction interfered with the jury's consideration of the mitigation evidence introduced, the penalty hearing was fundamentally unfair and the death sentence cannot be upheld with any confidence. Consequently, a new penalty is necessary.

_____, J.
Saitta

SUPREME COURT
OF
NEVADA

(O) 1947A